Hagist Ranch, Incorporated v. Commissioner.
Hagist Ranch, Inc. v. Commissioner
Docket No. 76174.
United States Tax Court
T.C. Memo 1960-206; 1960 Tax Ct. Memo LEXIS 83; 19 T.C.M. (CCH) 1123; T.C.M. (RIA) 60206; September 30, 1960
*83 Where a corporation's Articles of Incorporation disclose a purpose to engage in business, the corporation having been continued for the personal convenience of the shareholders, and the corporation having held legal title to 20,000 acres of Texas realty, received a substantial income from leases on the property, executed various leases and contracts, had many of the indicia of corporate life, such as active directors and officers, numerous corporate meetings, and bank accounts, paid fees and salaries to its personnel, and retained salaried agents to conduct negotiations on its behalf and to manage the property, held, such corporation carried on business and had a tax identity distinct from the stockholders. Francis J. Sullivan, Esq., Wilbert J. Hohlt, Esq., Holston Building, Nashville, Tenn., James B. House, Esq., and James C. Thompson, C.P.A., for the petitioner. Claude R. Sanders, Esq., and William A. Goffe, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioner's income tax in the amounts and for the years as follows: Year
Deficiency
1955
$8,893.82
1956
260.00 Petitioner assigns as errors the disallowance of its claims for refund for the years 1955 and 1956 in the amounts of $23,691.43 and $37,591.23, respectively, and the disallowance of petitioner's deductions for attorneys' and trustee's fees in those years. The major issue is whether petitioner should be recognized and treated as a taxable entity separate and distinct from its shareholders, and which is itself "doing business." A secondary issue concerns the deductions of the fees. Findings of Fact Some of the facts are stipulated and are so found, the stipulation being incorporated herein by this reference. Hagist Ranch, Incorporated, hereinafter referred to *85 either as the petitioner or the corporation, is a Texas corporation having its principal office in Mascoutah, Illinois. The returns for the years 1955 and 1956, here involved, were filed with the district director of internal revenue at Springfield, Illinois. E. R. Hagist, hereinafter sometimes referred to as Hagist, owned approximately 20,000 acres of land in Texas. Under the terms of a contract entered into in 1932 between Hagist, Earl C. Frates, and Herschel Cooper, if the latter two individuals were successful in selling $150,000 worth of oil and gas leases, they were to receive title to an undivided one-half interest in the 20,000 acres. They performed as provided and received title to the land. Thereafter, but prior to 1939, Hagist became a debtor in bankruptcy in the United States District Court for the Eastern District of Illinois. His one-half interest in the Texas land was an asset of his debtor estate. Hagist died testate on November 20, 1938. Louis J. Scheve, hereinafter sometimes referred to as Scheve, was appointed executor of the estate. In Item Two of the will, the testator confirmed the conveyances and instruments executed by him in the bankruptcy proceeding. *86 Pursuant to Item Seven the residue was to be held in trust with Scheve and Harry Troll as trustees. The will provided, inter alia, in Item Fifteen, third paragraph, that the trustees were authorized - "Also to enter into any settlement, compromise, trust arrangement, or incorporation of any and all property in which I may have an interest, belonging to my Debtor Estate now being administered in the United States Court. With authority to enter into such arrangement with any and all of the creditors of said Debtor Estate or any of the parties interested in the same, including my heirs and legatees, for the purpose of securing an extension of time in addition to that now granted in said proceeding or transfer of the assets of said Debtor Estate to a Trustee or corporation, for the purposes of enabling the liquidation of the assets of the same in a more orderly and timely manner, and to carry on the same for the benefit of my creditors, heirs and legatees, to the best possible advantage." The residuary estate included decedent's interest in the 20,000 acres. In 1939 the bankruptcy creditors representing claims for $232,444.56 formed a Creditors' Protective Trust and designated Scheve *87 trustee. The agreement authorized the trustee to execute the trust, if deemed advisable, through a corporation. If the corporate form was used, the stock of such corporation was to be divided between preferred and common stock. The preferred stock was to be issued to the creditors and was to be "preferred as to assets and dividends" and "callable at par and redeemable out of the income and sale of the assets turned over to said corporation by the Trustee." The common stock was to be issued to the trustee with the power to vote it until the redemption of the preferred stock. After the redemption and all the expenses incurred in executing the trust and forming the corporation were paid, the common stock was to be turned over to Hagist's legal representatives or heirs and all income was then to be paid to them. Petitioner was incorporated as a Texas corporation on or about August 8, 1939. Paragraph II of the Articles of Incorporation provided: "The purpose for which it is formed, is the establishment of land companies to buy, own, sell and convey real estate and minerals, and engage in mining, agriculture and stockraising, as authorized by Sub-division 80-A of Article 1302 of the *88 Texas Revised Civil Statutes of 1925." The corporation had the power under the Texas statutes to purchase and sell property and to enter into contracts. The capital stock of the corporation was arranged as was provided in the Creditors' Protective Trust Agreement. Three hundred preferred shares were issued to the creditors and 100 common shares were issued to Scheve as trustee of the creditors' trust. Dividends were not to be paid on the common stock until all the preferred stock was redeemed and cancelled. Both classes had equal voting rights. The preferred shares could be redeemed at any time by the payment of not in excess of $800 per share. The bylaws, besides the usual provisions concerning directors and officers and the duties thereof, provided in Article VI, Sec. 3, that the directors could declare quarterly dividends of the earnings of the corporation or carry all or any part of the residue in the surplus account or account of undivided profits or for the use in improvements as they deemed best. On or about August 24, 1939, petitioner, by warranty deed, acquired the one-half interest in fee simple title to the 20,000 acres of land in Texas held by Scheve as part of *89 the debtor estate. Scheve, Edward A. or Edward P. Hollman, [1] and Gus F. Fries were selected as directors. The same individuals were elected president, vice-president, and secretary-treasurer, respectively, and acted in those positions until February 1955. A corporate seal and printed letterheads were adopted and utilized. Annual reports reflecting petitioner's operations for each year since incorporation were prepared and adopted by the directors. Various expenses were incurred in the corporate name. Petitioner's directors met 99 times in the years 1939 through 1956. There were also 17 shareholders' and 13 organization meetings. Minutes were taken of the business discussions at all the meetings. Until February 1955 the management and operation of the Texas land was discussed at such meetings. Throughout its corporate existence petitioner executed in excess of 80 gas and oil leases respecting its one-half interest in the Texas realty. These leases were negotiated from 1939 through 1954 by Earl C. Frates and Herschel Cooper, the other one-half owners of the *90 land, under an oral agency agreement with petitioner. As negotiated, the leases were forwarded to petitioner's officers for action. The director-officers discussed the leases and adopted resolutions accepting them and authorizing various of the officers to execute the necessary instruments. Herschel Cooper died in 1954, and his son, Taliaferro Cooper, took over his interests and activities. On May 19, 1955, the directors on behalf of petitioner, Earl C. Frates, and Taliaferro Cooper entered into a written agreement whereby the latter two individuals were to act as general agents in the negotiation of gas and oil leases on behalf of all three parties. The agreement contained, inter alia, the following terms and conditions: I. For and in consideration of the mutual covenants and agreements, hereinafter set out to be kept and performed by Agents, Principal [the corporation] hereby employs, appoints and constitutes the said EARL C. FRATES and TALIAFERRO COOPER as its sole and exclusive Agents, upon the terms and provisions hereinafter set out, for the management and operation of the entire interest of Principal in the above described Hagist Ranch * * * for the development of *91 oil, gas and other minerals and the leasing of said land for such purposes. * * * II. It is especially understood and agreed that the power and authority herein given and granted to Agents to effect sales of oil, gas and mineral leases and to effect development contracts, as hereinabove set out, is exclusive of all third persons and of the Principal hereto. III. Principal especially promises, agrees and obligates itself to execute and acknowledge promptly and properly any and all oil, gas and mineral leases, unitization agreements, pooling agreements, development contracts, conveyances, assignments and other instruments herein contemplated, when requested so to do by Agents, without inquiry or investigation as to the grantee or lessee in any such instrument, or as to the amount or character of consideration therefor, or as to the terms and provisions of any such instrument. * * * ATTEST: HAGIST RANCH, INC. /s/ Edna E. Richter / Secretary By /s/ Rayhill O. Hagist / President PRINCIPAL EARL C. FRATES TALIAFERRO COOPER AGENTS The agents received monthly compensation for such activities. The director-officers at no time personally negotiated any of the gas and *92 oil or other agreements on behalf of petitioner. Since 1955 petitioner's officers executed only the instruments as forwarded by Taliaferro Cooper. Petitioner received bonus payments, royalties, and other income from the leases and other conveyances executed on its behalf. Petitioner was also a party with Earl C. Frates and Herschel or Taliaferro Cooper in the following additional conveyances: Year
Instrument
Contents
1939
Warranty deed
1,280 acres in Duval County, Texas
1942
Contract
Geophysical survey of the realty
1945
Warranty deed
16,971.82 acres in Duval and McMullen Counties,
Texas
1951
Gas Unitization agreement
[With Delhi Oil Corporation]
1952
Right-of-way agreement
1952
Gas Unitization agreements
[With Atlantic Refining Company]
1953
Easement deed
1956
Division Order
Royalty interest with Atlantic Refining Company
For the years 1939 through 1956 petitioner filed corporate income tax returns reflecting gross income, deductions, net income, and taxes due as follows: Total
Total
Net
Total
Year
Income
Deductions
Income
Tax Due
1939
$ 1,682.84
$ 884.29
$ 798.55
$ 99.82
1940
2,125.50
2,007.15
118.35
17.58
1941
3,083.40
2,064.36
1,019.04
214.00
1942
10,966.54
4,822.28
6,144.26
1,558.95
1943
20,146.77
8,087.36
12,059.41
1,918.97
1944
25,238.82
8,401.66
16,715.91
3,278.85
1945
20,233.97
6,243.89
27,595.35
6,561.60
1946
11,758.61
3,652.85
8,105.76
1,764.33
1947
25,788.28
7,277.94
18,510.34
4,157.38
1948
4,131.81
1,823.29
2,308.52
484.79
1949
26,065.47
9,463.67
16,601.80
3,718.42
1950
39,926.70
14,764.94
25,161.76
5,842.40
1951
15,122.15
2,942.35
12,179.80
3,501.68
1952
63,370.80
25,908.09
37,462.71
17,719.42
1953
104,673.22
55,755.74
48,917.48
27,112.33
1954
150,542.30
52,981.99
97,560.31
45,231.36
1955
129,220.09
73,082.73
56,137.36
23,691.43
1956
142,305.82
59,438.07
82,867.75
37,591.23
*93 The sum of $40,000, received for the sale of surface rights to part of the Texas realty prior to petitioner's incorporation, was deposited in a Texas bank on August 7, 1939, for a short period of time in order to facilitate the obtaining of the corporate charter. On or about September 2, 1939, a bank account in the First National Bank of Mascoutah was opened on behalf of petitioner. The account was maintained through 1956. The account reflected beginning and ending balances, deposits and withdrawals by check for each year as follows: Beginning
Total
Total
Ending
Year
Balance
Deposits
Withdrawals
Balance
1939
$ 58,460.80
$ 33,250.45
$25,210.35
1940
$25,210.35
2,497.79
20,576.70
7,131.44
1941
7,131.44
3,083.40
7,307.03
2,907.81
1942
2,907.81
10,966.54
10,374.96
3,499.39
1943
3,499.39
20,169.67
15,412.26
8,256.80
1944
8,256.80
25,238.82
30,542.61
2,953.01
1945
2,953.01
62,137.20
20,881.48
44,208.73
1946
44,208.73
13,439.16
43,561.92
14,085.97
1947
14,085.97
25,790.26
30,429.70
9,446.53
1948
9,446.53
4,131.81
11,745.04
1,833.30
1949
1,833.30
26,139.56
23,215.64
4,757.22
1950
4,757.22
41,504.34
34,280.01
11,981.55
1951
11,981.55
15,534.51
17,072.77
10,443.29
1952
10,443.29
63,371.42
25,823.28
47,991.43
1953
47,991.43
104,673.22
117,809.64
34,855.01
1954
34,855.01
150,542.30
122,396.29
63,001.02
1955
63,001.02
121,350.03
158,118.49
26,232.56
1956
26,232.56
134,469.98
110,179.12
50,523.42
*94 Various tax returns were prepared by petitioner's accountants and filed on behalf of the corporation, including capital stock taxes, domestic franchise taxes, and local personal and real property taxes, for part of or all of the years from 1939 through 1956. Since incorporation, petitioner has paid salaries to its staff and paid fees and expenses to its directors until at least February 1955. In addition to the amounts paid periodically as directors' fees, on February 18, 1954, petitioner paid each director $6,000 for his services as director during the period 1939 through 1953. The directors approved the payment of $50 per meeting to one director, Byron O. House, in 1956. Edna Richter handled the secretarial duties for petitioner. She was regularly a full-time employee of the First National Bank of Mascoutah. Although she was paid a fee from time to time for her services on behalf of the corporation, she was at no time a regular employee of the corporation. On October 13, 1939, petitioner retained a firm of certified public accountants to establish a proper accounting system. Whatever books were kept for petitioner were kept by these accountants and maintained for petitioner *95 since that date. The corporation never conducted any gas and oil operations in connection with the Texas land. For the most part, petitioner's activities consisted of the execution of the various leases and contracts. Petitioner had no equipment of its own, and it did not maintain an office or telephone. As a result of the income derived from the leases and other contracts, petitioner made periodic payments of profit dividends and liquidation dividends and interest to retire and redeem the preferred stock held by the creditors. Such stock was called prior to June 30, 1954. A total of $5,959.70 was paid as interest in 1953 and 1954. The director-officers gave some consideration to the possibility of liquidating the corporation. However, the corporate entity was continued in order to facilitate the execution of the leases and to avoid the necessity of partitioning of the realty between the owners. After the redemption of the preferred stock and payment of all the expenses of the trust, Scheve, as trustee of the creditors' trust, transferred the 100 shares of common stock to Scheve, as executor of Hagist's estate. The legal title in petitioner's common stock was transferred to *96 Hagist's heirs. During the annual meeting and special directors' meeting held in February 1955, the heirs became the directors and officers of the corporation. Through their ownership of all of petitioner's stock and as directors and officers, the heirs were in complete ownership and control of the corporation during 1955 and 1956. The amended bylaws, dated February 17, 1955, gave the directors complete control over the declaration of dividends. The following are examples of the activities and actions undertaken at the shareholders' or directors' meetings during 1955-1956: Approval of several amendments to the bylaws; approval of regular dates for directors' meetings; approval of the payment of numerous bills; declaration of dividends on the common stock; appointment of a director to investigate the decline in royalty receipts; instructions to several directors to invest in short-term Government obligations; and the approval of fees for director Byron O. House. On February 21, 1955, the heirs executed a declaration of trust conveying legal title to the common stock to the First National Bank in Mascoutah as trustee. The trust contained, in part, the following provisions: 8. *97 TRUSTEE shall not sell, assign or hypothecate any of said stock without the consent in writing of not less than eighty percent (80%) in amount of the outstanding beneficial interests hereunder. 9. Dividends upon said stock will be declared quarterly, or at such times as will be fixed by the Board of Directors of said corporation, and such dividends shall be paid to TRUSTEE. TRUSTEE shall then distribute the net proceeds of such dividends, after deducting its compensation as TRUSTEE as herein fixed, to the owners of the beneficial interests hereunder in proportion to their interests, such distribution to be made within ten (10) days after receipt by it of such dividend. * * *
12. It is understood that this is a passive or naked trust created for the purpose of holding naked legal title for the joint convenience of the beneficiaries and nothing contained in this Declaration shall be construed as imposing any obligation on the TRUSTEE to file any income, profit or other tax reports or schedules, it being expressly understood that the corporation will file its returns and that the beneficiaries from time to time will individually make all such reports, and pay any and all taxes *98 required with respect to payments made at the closing out of their interest under this Declaration of Trust. The trustee then distributed the net proceeds of such dividends, after deduction of its compensation, to the owners of the beneficial interest as set forth in the trust instrument. The director-officers approved the payment of the following amounts to the attorneys on the dates listed: Date
Attorneys
Amount
2/21/55
Martin F. Oehmke
$ 6,603.50
2/21/55
A. D. Riess and House &
House
10,000.00
Martin F. Oehmke was originally retained in 1939 as petitioner's counsel. He was to be paid on a fee basis rather than on a retainer. He performed various legal services for the corporation, such as examining the leases, from 1939 through at least 1954. He performed services for the heirs during 1954 and 1955. At least $1,625 of the fee paid in 1955 represented payment for services rendered to petitioner. A. D. Riess and House & House performed services both for the heirs and the corporation. Not less than three-fourths of the work done by the attorneys was done on behalf of petitioner. At least $7,500 of the fee paid in 1955 represented payment for such *99 work. Petitioner deducted "Trustees Fees" in the amount of $500 for each of the years 1955 and 1956 as ordinary and necessary business expense. None of the trustee fees were business expenses of petitioner. Opinion VAN FOSSAN, Judge: The major issue is whether petitioner should be treated as a taxable entity separate from its shareholders. Petitioner also raises the issue, assuming we sustain respondent, whether certain interest payments made to creditors in 1953 and 1954 are deductible expenses. Since these years are not before us, we cannot pass on the question. The tests of whether a corporation may be disregarded and the tax incidents attributed to the "shareholders" themselves were set forth in Jackson v. Commissioner, 233 F. 2d 289 (C.A. 2), affirming 24 T.C. 1, as follows: "A corporation may not be disregarded in respect of taxation if, inter alia, a bona fide intention in creating it was that the corporation itself should have some real substantial business function, or if it actually engages in business; on the other hand, the corporation may be disregarded, in the absence of such an intention or activity. The intended or actual business *100 functioning of the corporation itself, not the taxpayer's aim to be accomplished via the corporation, is the test." See Wells v. Hiskett, 288 S.W. 2d 257. Petitioner contends that it was formed in order to liquidate the creditors' claims in an orderly manner and not to engage in business. Further, petitioner claims that it did not engage in any business activities, though permitted by its charter. Finally, it takes the position that it continued in existence after the creditors dropped from the picture for the convenience of Hagist's heirs, and is no more than a mere conduit through which the lease income passed to the heirs. In support of its position, petitioner points to such factors as the real purpose behind the incorporation, the surrounding circumstances of the incorporation, the agency contract, the lack of tangible corporate personalty, and its nonparticipation in the exploitation of the minerals on its land. Respondent argues that petitioner was created with the intention of engaging in business and did, in fact, engage in extensive business activities. Respondent requests us to treat petitioner as separate from its shareholders and, as such, subject *101 it to taxation. Sec. 11, Internal Revenue Code of 1954. So to find, respondent would have us recognize and rely upon such facts as the stated purpose of the corporation found in the Articles of Incorporation, the directors' command over its income, the extensive leasing operations, and other indicia, such as the corporate seal, printed stationery, and the filing of various tax returns. Petitioner cannot prevail if it qualifies for treatment as a taxable entity under the tests set out in Jackson v. Commissioner, supra. The Articles of Incorporation explicitly outline the purposes of the corporation, to wit: "establishment of land companies to buy, own, sell and convey real estate and minerals, and engage in mining, agriculture and stockraising". These purposes are evidence of petitioner's intention to engage in business. Petitioner, however, adduced testimony to the effect that the real purpose of incorporating was to facilitate the handling of the creditors' claims and that its subsequent purpose was to avoid any difficulty in dealing with the numerous heirs. There is ample authority for sustaining respondent, for income tax purposes at *102 least, on the ground that the "parties are not at liberty to say their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted." Helvering v. Coleman-Gilbert, 296 U.S. 369, 374; Buckley v. Commissioner, 231 F. 2d 204 (C.A. 2), affirming 22 T.C. 1312; and Sears v. Hassett, 111 F. 2d 961 (C.A. 1). However, under the facts of the instant case we are able to rest our decision on broader grounds. Petitioner, by arguing that its purpose was to protect the creditors and later to help the heirs, places itself within the framework of the rule outlined in Moline Properties v. Commissioner, 319 U.S. 436. In that case, which is considered the definitive holding on this question, the Supreme Court stated (pp. 438-439): "The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity *103 or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [Italics supplied.] The purposes put forward by petitioner fit within those enumerated by the Supreme Court as providing an adequate basis upon which to sustain the corporate entity. Petitioner's activities during its existence were such that it can properly be characterized as actually engaged in business. The solution lies in the circumstances surrounding petitioner's corporate life, and requires that we carefully sift and weigh the various facts in reaching a decision. We recognize that petitioner had its inception in the demands of creditors, but we have heretofore commented that such an origin is an accepted "business" reason or purpose. We have also considered the fact that petitioner's director-officers did not personally negotiate the gas and oil leases and other contracts, that it had no personal property, that petitioner did not itself exploit its rich mineral lands, and that petitioner kept no business office. Nevertheless, on the record the balance must be struck in favor of respondent. The bylaws gave the directors complete command over petitioner's *104 funds. It was they who declared or withheld dividends. The director-officers were elected each year and were paid fees and salaries for their services at least until 1955. Thereafter, at least one director was paid a fee. A corporate seal was adopted. Petitioner corresponded on its own letterhead stationery. Annual reports were made, discussed, and accepted at the various shareholders' and directors' meetings. Expenses, such as printing, postage, travel and insurance, were incurred in petitioner's name and paid by petitioner. The directors met 99 times in the years 1939 through 1956. Altogether 17 shareholders' and 13 organizational meetings were held during the same period. Until February 1955, the directors discussed the merits of the gas and oil leases and other contracts at these meetings. The directors considered and approved improvements to the land. Additional acreage, as disclosed by surveys, was purchased. Two sales of the surface rights to land were made. Such purchases and sales were within petitioner's powers and purposes as provided in the charter. Some of the director-officers visited the realty, and made reports at petitioner's meetings. Its Texas agents came to *105 Illinois from time to time and reported on the prospects and conditions of the land. In excess of 80 leases were executed by petitioner. Often the leases were discussed by the directors, and sometimes the leases had to be reconsidered because of additional demands or changes by the lessees. Only petitioner could renew the leases. Expenses were incurred in connection with the leasing activities. Various deeds and gas unitization agreements were negotiated for and executed by petitioner. Admittedly, only a few such transactions were entered into in 1955 and 1956, but these support the pattern of consistent activity by petitioner. Furthermore, the very nature of successful leasing operations is such that there would be less activity in the later years. The Articles of Incorporation provided that petitioner's purpose was leasing. Petitioner was the lessor. Royalties, fees, and lease income were paid to the lessor. We cannot hold in the face of the record that petitioner was but a hollow shell with just sufficient activity to sustain its corporate life. We think it obvious that these activities are beyond a mere holding of bare legal title or a "passive titleholder." Petitioner filed *106 corporate income tax returns for the years 1939 through 1956, reporting income as earned in its name and claiming sundry deductions in its own right. Other tax returns, particularly on the local governmental level, were filed by petitioner. It consistently maintained a bank account whose records indicate numerous deposits and withdrawals, both of which mirror a diverse pattern of activity and a vigorous existence. In addition to the fees and salaries paid to the director-officers, petitioner made payments to its administrative staff. It appears that social security taxes were paid. Petitioner employed accountants to set up a system of bookkeeping, and the accountants rendered financial statements and advice to petitioner from time to time. It is reasonable to conclude that petitioner must have had at least rudimentary books. The facts touched upon above and others found in our Findings of Fact buttress us firmly in the conviction that not only was it petitioner's purpose to engage in business but that it did in fact engage in corporate activities in the nature of "doing business." The tests set forth in Jackson v. Commissioner, supra, are satisfied and support *107 the finding of the respondent. Moline Properties v. Commissioner, supra; Sears v. Hassett, supra; Buckley v. Commissioner, supra; Flint v. Stone Tracy Co., 220 U.S. 107. After the heirs received title to the common stock, petitioner entered into an agency agreement whereby Earl C. Frates and Taliaferro Cooper were to take over the management of the realty and were constituted the sole agents in the negotiation of leases. The petitioner had merely to "rubber-stamp" the agents' acts. Prior to that time, the leases were negotiated by Earl C. Frates and Herschel Cooper under an oral agreement. The agents in both instances were compensated for their services. The payment of monthly salaries ends any contention that the agents acted for the corporation only because they, too, had an interest in the realty. Petitioner, relying upon this agreement, argues that its activities were really carried out by the agents, and hence it really did nothing which could be interpreted as "doing business." Thus, petitioner seeks to escape the imposition of corporate tax by the delegation of its functions to agents. But the various activities outlined *108 above are sufficient in themselves to overcome this argument. Assuming, arguendo, that petitioner did nothing except through Frates and Cooper, petitioner cannot avoid the tax because these agents acted on its behalf (as well as on their own behalf in view of their one-half interest in the property). A corporation can do nothing except through the intervention of a human agency. Petitioner had authority to appoint agents and the acts of the agents were petitioner's acts and fully binding upon it. Petitioner specifically reserved the right to terminate the contract and by inference the right to supervise the agents' activities to make sure that they followed the terms of the agreement. The cases of United States v. Emery, 237 U.S. 28, Zonne v. Minneapolis Syndicate, 220 U.S. 187, and Rose v. Nunnally Inv. Co., 22 F. 2d 102 (C.A. 5), cited by petitioner, are distinguishable on the grounds, among others, that those cases involved restricted charters which authorized the respective entities to exercise limited powers. Here, besides engaging in extensive activities not present in those cases, petitioner was fully empowered by its Articles to engage *109 in business. The cases of McCoach v. Minehill Railway Co., 228 U.S. 295, Eaton v. Phoenix Securities Co., 22 F. 2d 497 (C.A. 2), Central Life Assur. Soc., Mut. v. Commissioner, 51 F. 2d 939 (C.A. 8), and 112 West 59th Street Corporation v. Helvering, 68 F. 2d 397 (C.A.D.C.), are similarly distinguishable on their facts. For the reasons set forth above and on the whole record, we hold that petitioner carried on business and, therefore, was a taxable entity distinct from its shareholders. The second issue concerns the fees. Petitioner produced no evidence and made no argument concerning the deduction of the trustee fees. Furthermore, it appears that such fees were paid to the trustee of the heirs' trust and hence were not an expense of petitioner. Respondent's disallowance of the trustee's fees is sustained. Martin F. Oehmke was originally retained as petitioner's counsel. The corporate minutes disclose that he was called upon to perform various legal services such as the interpretation of leases and contracts. His office was used from time to time for directors' meetings. He received no yearly retainer but was paid strictly *110 by fees. The fee in issue here was paid in February 1955. Oehmke was paid no fee in 1954, although there is a reference in the minutes to the use of legal advice in 1954. However, Oehmke did perform services for the heirs in both the years 1954 and 1955. Considering the fees paid for his prior services to petitioner, we think that $1,625 of the fee paid in 1955 represented payment by petitioner for services rendered to it. A. D. Riess and House & House performed services both for the heirs and the corporation, and it appears that the work was mutually performed. Byron O. House, presently Chief Justice of the Illinois Supreme Coutt, testified that at least 75 per cent of the work was done on behalf of petitioner. We hold that $7,500 of the $10,000 fee paid in 1955 represented payment for such work. Decision will be entered under Rule 50. Footnotes
1. Edward A. Hollman died in 1946 and his son, Edward P. Hollman, took his place as director and vice-president.↩