T.C. Memo. 1996-380

UNITED STATES TAX COURT

CHARLES R. HARP AND APRIL B. HARP, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7456-94.                    Filed August 19, 1996.

<u>Gary R. DeFrang</u>, <u>Joseph M. Wetzel</u>, and <u>Russell A. Sandor</u>,
for petitioners.

<u>Cheryl B. Harris</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following defi-
ciencies in, and accuracy-related penalties on, petitioners'
Federal income tax:

| Year | Deficiency | Accuracy-Related Penalty Section 6662(a)[1] |
|------|------------|------------------|
| 1989 | $235,120 | $47,024 |
| 1990 | 95,898 | 19,180 |

---

[1]  All section references are to the Internal Revenue Code in
effect for the years at issue.  All Rule references are to the
Tax Court Rules of Practice and Procedure.

The issues remaining for decision are:

(1)  Do petitioners have unreported income for each of the years 1989 and 1990?  We hold that they do to the extent stated herein.

(2)  Are petitioners liable for self-employment tax for each of the years 1989 and 1990?  We hold that they are to the extent stated herein.

(3)  Are petitioners liable for the accuracy-related penalty under section 6662(a) for each of the years 1989 and 1990?  We hold that they are to the extent stated herein.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners resided in Hillsboro, Oregon, at the time the petition was filed.  They filed joint Federal income tax returns (returns) for the years 1989 and 1990.

Charles Harp Construction

During the years at issue, petitioner Charles R. Harp,[2] who as of the time of the trial herein had a high school education and had not received any formal training in accounting or book-keeping matters, operated a sole proprietorship under the name "Charles Harp Construction" (sole proprietorship) that he had started in 1984 and that engaged in the residential construction

---

[2]  Hereinafter, references to petitioner in the singular are to petitioner Charles R. Harp.

business.  During those years, Charles Harp Construction, which petitioner operated from an office located in Hillsboro, Oregon (Hillsboro), acted as a general contractor.  As such, Charles Harp Construction located and purchased lots as sites for the construction of houses, worked with lenders to obtain financing for its purchase and construction activities, hired and supervised subcontractors with respect to those construction activities, and arranged for the sales of the houses it constructed.  During the years at issue, petitioner generally financed his sole proprietorship activities by obtaining construction loans from Washington Federal Savings Bank (Washington Federal) at its branch in Portland, Oregon (Portland branch), where its construction loan department was located.

During 1989, petitioner's license as a general contractor expired, at which time Charles Harp Construction ceased undertaking any new construction projects.  At some unknown time during 1990, Charles Harp Construction completely terminated its operations except for limited activities that generally consisted of selling houses constructed prior to that year.

During 1989 and 1990, petitioner maintained the books and records, including the general ledger, of his sole proprietorship and issued checks in payment of expenditures that he incurred in connection with the operations of that business.

## Kabeiseman & Harp, Inc.

On February 6, 1989, petitioner and Robert Kabeiseman (Mr. Kabeiseman) formed Kabeiseman & Harp, Inc. (K & H) as an Oregon corporation to engage in the residential construction business. During the years at issue, K & H operated from an office located in Hillsboro that it shared with Charles Harp Construction. K & H elected to be taxed as an S corporation.

During the years at issue, petitioner and Mr. Kabeiseman each owned 50 percent of the issued and outstanding stock of K & H and were its only officers and directors. During those years, petitioner served as the president of K & H and in that capacity, inter alia, arranged for the financing of its construction projects and supervised the progress of such projects. Mr. Kabeiseman served as the treasurer and secretary of K & H during the years at issue and in those capacities, inter alia, maintained its books and records, including its general ledger and job cards, and prepared its checks to pay for corporate expenditures. Neither petitioner nor Mr. Kabeiseman received a salary from K & H during 1989 or 1990.

During the years at issue, K & H financed its activities by obtaining construction loans from the Portland branch of Washington Federal (K & H construction loans), a financial institution at which K & H did not maintain a checking account. Those loans

were personally guaranteed by petitioner[3] and by Mr. Kabeiseman and had maturity dates of six months, nine months, or one year. During those years, as the construction work on each of K & H's construction projects progressed and costs were incurred in connection therewith, petitioner submitted a written draw request to Washington Federal for a portion of K & H's construction loan proceeds for each such project (draw request) in order to pay the costs so incurred.  He made such a request either by personally presenting it to that bank's Portland branch or by presenting it to that branch by facsimile transmission.  Each draw request that petitioner so presented asked Washington Federal either to transfer a portion of K & H's construction loan proceeds for each such project to petitioners' account at that institution or to issue a check for those proceeds to K & H.  Washington Federal complied with the draw requests that petitioner submitted either by transferring the loan proceeds sought to petitioners' account at the branch of that institution located in Hillsboro (Hillsboro branch) or by issuing a check to K & H for those proceeds.

In July 1989, K & H contracted to build a house for Milagros Velilla (Ms. Velilla).  Ms. Velilla, and not K & H, obtained a construction loan with respect to that contract (Velilla con-struction loan) from the Portland branch of Washington Federal where she maintained a checking account.  As he did with other K

---

[3]  The record is not clear as to whether petitioner April Harp (Ms. Harp) also guaranteed those loans.

& H construction projects, during 1989 and 1990, petitioner submitted draw requests to Washington Federal for a portion of those loan proceeds in order to pay the costs incurred by K & H in constructing Ms. Velilla's house, and Washington Federal complied with those requests either by transferring the loan proceeds sought to petitioners' account at its Hillsboro branch or by issuing a check to K & H for those proceeds.

During 1990, K & H encountered financial difficulties, did not have sufficient funds to meet its outstanding obligations, and was unable to obtain funds from its construction loan accounts because various construction projects were stalled. As of the spring of 1990, petitioner ceased being actively involved in the operations of K & H and ceased carrying out the responsibilities that he had undertaken in connection with those operations. K & H completely terminated its business operations sometime during 1991.

Deposits into and Disbursements
From Petitioners' Accounts
<u>During the Years at Issue</u>

During 1989, petitioners maintained accounts at the Hillsboro branch of Washington Federal, Far West Federal Bank (Far West Federal), and Benjamin Franklin Federal Savings and Loan Association (Benjamin Franklin Federal). During 1990, in addition to those accounts, petitioners maintained accounts at Bank of America and West One Bank and three additional accounts at Benjamin Franklin Federal. During the years at issue, petition-

ers used one or more of their various bank accounts (accounts), inter alia, in order to pay their personal expenses, to pay expenses incurred in connection with the operations of petitioner's sole proprietorship, and to make payments to, or on behalf of, K & H.  During those years, petitioners deposited into one or more of their accounts funds from various sources, including funds obtained by petitioner in connection with the operations of his sole proprietorship, funds obtained by petitioner through draw requests for proceeds of construction loans that had been made to K & H and to Ms. Velilla, respectively, funds obtained by petitioner from Mr. Kabeiseman, and funds obtained by petitioners from certain other identified sources and certain unidentified sources.

Deposits of K & H's Construction Loan
Proceeds, Checking Account Funds, and
Credit Line Funds and Ms. Velilla's
Construction Loan Proceeds and
Checking Account Funds

During 1989, petitioner deposited the following funds into petitioners' account at the Hillsboro branch of Washington Federal:  (1) $498,972.70 from the K & H construction loan accounts at the Portland branch of Washington Federal, (2) $35,000 from the K & H credit line at Washington Federal, and (3) $10,351.27 from the K & H checking account.  During that year, petitioner also deposited $27,394 from Ms. Velilla's construction loan account at the Portland branch of Washington Federal into petitioners' account at its Hillsboro branch.

During 1990, petitioner deposited the following funds into either petitioners' account at the Hillsboro branch of Washington Federal or into their account at Benjamin Franklin Federal: (1) $76,570.46 from the K & H construction loan accounts at the Portland branch of Washington Federal and (2) $5,000 from the K & H checking account. During that year, petitioner also deposited into petitioners' account at the Hillsboro branch of Washington Federal $27,225 from Ms. Velilla's construction loan account and $7,528 from her checking account at that bank.[4]

With respect to petitioner's deposits during 1989 and 1990 of K & H's construction loan proceeds into petitioners' account at Washington Federal, petitioner began making those deposits in April 1989. It was only in May or June 1989, after petitioner had made the first few such deposits, that Mr. Kabeiseman became aware that petitioner had made those deposits. As soon as he became aware that petitioner was depositing K & H construction loan proceeds into petitioners' account at Washington Federal, Mr. Kabeiseman disapproved of what petitioner had done. Specifi-

---

[4] Hereinafter, (1) funds that petitioner obtained from K & H's construction loan accounts, checking account, and/or credit line and that he deposited into petitioners' accounts during one or both of the years at issue will sometimes be referred to as K & H's funds; (2) funds that petitioner obtained from Ms. Velilla's construction loan account and/or checking account and that he deposited into petitioners' accounts during one or both of the years at issue will sometimes be referred to as Ms. Velilla's funds; and (3) K & H's funds and Ms. Velilla's funds will sometimes be referred to collectively as K & H's and Ms. Velilla's funds.

cally, Mr. Kabeiseman advised petitioner at that time that petitioner's deposits of K & H construction loan proceeds into petitioners' account at Washington Federal was not a good accounting practice, that Mr. Kabeiseman was unable to trace to any particular construction loan account of K & H the direct payments that petitioner had made to it during May or June 1989 of certain of its construction loan proceeds, that petitioner should direct Washington Federal to issue checks directly to K & H for the K & H construction loan proceeds sought in the draw requests that petitioner made, and that such checks should be deposited into K & H's checking account.  Petitioner nonetheless continued to deposit K & H construction loan proceeds into petitioners' account at Washington Federal after May or June 1989 and through July 1990.  Mr. Kabeiseman did not at any time during the years at issue (1) authorize petitioner to deposit during those years the K & H construction loan proceeds into petitioners' accounts or (2) know the amounts of such proceeds that petitioner so deposited.

During each of the years at issue, petitioner retained certain of the K & H construction loan proceeds that he deposited into petitioners' account at Washington Federal during each such year and did not use all of those construction loan proceeds to make payments to, or on behalf of, K & H.  Mr. Kabeiseman did not at any time during the years at issue (1) authorize petitioner to retain any of the K & H construction loan proceeds that he had

deposited into petitioners' account at Washington Federal or (2) know the amounts of such deposits that petitioner retained.

With respect to petitioner's deposits during 1989 and 1990 of Ms. Velilla's construction loan proceeds into petitioners' account at Washington Federal, the contract between Ms. Velilla and K & H, which was called and is hereinafter referred to as a contractor agreement, set forth the terms and conditions for K & H's disbursements of her construction loan proceeds. The contractor agreement did not authorize petitioner (1) to deposit Ms. Velilla's construction loan proceeds into petitioners' accounts or (2) to retain any portion of those deposits for petitioners' own purposes. That agreement specifically provided that disbursements from Ms. Velilla's construction loan account were to be made "only to pay for costs of labor on and materials for the Project pursuant to plans and specifications submitted to and approved by Lender."

During 1989, petitioners made the following disbursements from their accounts: (1) Payments to K & H in the amount of $474,467.56 and (2) payments of K & H expenses in the amount of $6,584.06. During 1989, the aggregate amount of K & H's funds and Ms. Velilla's funds that petitioner deposited into petitioners' account at Washington Federal exceeded the aggregate amount that petitioners paid to, or for the benefit of, K & H and Ms. Velilla by $90,666.35.

During 1990, petitioners made the following disbursements

from their accounts: (1) Payments to K & H in the amount of $52,462 and (2) payments of K & H expenses in the amount of $3,693.40. During 1990, the aggregate amount of K & H's funds and Ms. Velilla's funds that petitioner deposited into petitioners' accounts at Washington Federal and Benjamin Franklin Federal exceeded the aggregate amount that petitioners paid to, or for the benefit of, K & H and Ms. Velilla by $60,168.06.

Miscellaneous Deposits

During 1989, in addition to the deposits of K & H's and Ms. Velilla's funds that are at issue for that year, certain deposits that respondent concedes do not constitute unreported income for that year, and one deposit that petitioners concede constitutes unreported income for that year,[5] petitioners made various deposits totaling $83,364 (miscellaneous deposits) that are at issue for 1989, including a deposit of $6,222.89 on May 30, 1989, into petitioners' account at Washington Federal. The record does not disclose and/or explain the nature or sources of those miscellaneous deposits.

During 1990, in addition to the deposits of K & H's and Ms. Velilla's funds that are at issue for that year and certain deposits that respondent concedes do not constitute unreported income for that year, petitioners made various miscellaneous

---

[5] Petitioners concede on brief that a $2,500 deposit on Apr. 24, 1989, of the proceeds from the sale of plans constitutes unreported income for 1989.

deposits totaling $41,583.71 that are at issue for 1990, including a deposit of $1,630.11 on May 2, 1990, into petitioners' account at the Hillsboro branch of Washington Federal. The $1,630.11 so deposited was obtained by petitioners from the sale of a 1988 Chevrolet pickup truck. The record does not disclose and/or explain the nature or sources of the remaining miscellaneous deposits.

Deposits of Funds that Mr. Kabeiseman
Transferred to Petitioner

On January 18, 1989, and on February 7, 1989, Mr. Kabeiseman transferred to petitioner $25,000 and $4,000, respectively, that petitioner deposited into petitioners' account at the Hillsboro branch of Washington Federal and that Mr. Kabeiseman expected petitioner to repay within approximately one year after the date on which each such transfer was made. (Hereinafter, we shall refer to the $29,000 that Mr. Kabeiseman transferred to petitioner in January and February 1989 as the Kabeiseman loans or the Kabeiseman loan proceeds.)

During 1990, petitioner paid the following amounts totaling $9,689.80 to Mr. Kabeiseman in repayment of the Kabeiseman loans:

| Jan. 1990 | $318.45 |
| Feb. 1990 | 734.45 |
| Mar. 1990 | 318.45 |
| Apr. 1990 | 318.45 |
| Apr. 1990 | 4,000.00 |
| July 1990 | 4,000.00 |

As of the time of the trial herein, petitioner had not repaid the entire balance of the Kabeiseman loans.

Mr. Kabeiseman did not have any discussions with petitioner regarding the respective outstanding principal balances of the Kabeiseman loans on or after January 18, 1990, and on or after February 7, 1990, the approximate respective dates on which Mr. Kabeiseman expected repayment of those loans. That was because Mr. Kabeiseman was preoccupied during 1990 with the financial problems that K & H was encountering. During 1990, no identifiable event occurred that made it clear that petitioner never would repay the respective outstanding balances of the Kabeiseman loans.

The Lawsuit Filed Against
Petitioner by Mr. Kabeiseman

During 1990, after petitioner ceased to be actively involved in the operations of K & H, a dispute arose between petitioner and Mr. Kabeiseman regarding certain moneys that petitioner allegedly owed Mr. Kabeiseman as petitioner's share of K & H expenditures that Mr. Kabeiseman had paid. Sometime thereafter, Mr. Kabeiseman retained the services of an attorney and instituted a lawsuit against petitioner regarding that dispute (lawsuit). In the complaint that Mr. Kabeiseman filed against petitioner, Mr. Kabeiseman requested that a judgment of $47,353.67 be entered against petitioner. In that complaint, Mr. Kabeiseman alleged that that amount represented petitioner's share of the following approximate amounts of K & H expenditures that Mr. Kabeiseman had paid: (1) $49,905 that Mr. Kabeiseman

had paid to U.S. National Bank as a repayment for loans that had been made by that bank to K & H and that had been personally guaranteed by both petitioner and Mr. Kabeiseman; (2) $41,731 that Mr. Kabeiseman had paid to a contractor for completion of the construction of certain houses so that the proceeds from the sale of those houses could be utilized to repay loans that had been made to K & H by Washington Federal and that had been personally guaranteed by both petitioner and Mr. Kabeiseman; and (3) $3,270 which Mr. Kabeiseman had paid to a K & H creditor named A-Boy Stores and for which petitioner had agreed to reimburse Mr. Kabeiseman.

On January 2, 1992, Mr. Kabeiseman and petitioner entered into a settlement agreement (settlement agreement) with respect to the lawsuit under which petitioner paid Mr. Kabeiseman $37,500. In that settlement agreement, in consideration for the payment of $37,500 by petitioner to Mr. Kabeiseman, Mr. Kabeiseman agreed to "release, acquit, and forever discharge CHARLES R. HARP of * * * any and all claims that were or could have been brought" by Mr. Kabeiseman in that lawsuit. Mr. Kabeiseman considered that settlement agreement to end all disputes between him and petitioner.

Petitioners' 1989 and 1990 Returns

Petitioners filed returns for 1989 and 1990 that were signed by them and by Francis J. Bernard (Mr. Bernard) as return preparer.

In their 1989 return, petitioners reported total income of

$24,034 consisting of the following:

| | |
|---|---|
| Wages and salaries | $4,816[6] |
| Interest | 365 |
| Business income | 17,203 |
| Capital gain | 71 |
| Ordinary gain | 1,579 |

In Schedule C of their 1989 return, petitioners reported

$465,400 of gross receipts, $448,197 of expenses, and $17,203 of

profit from the operations of petitioner's sole proprietorship

Charles Harp Construction that they described therein as a

general contracting business. Petitioners did not report in

Schedule C, or elsewhere, in their return for that year income

from any business other than Charles Harp Construction.

In their 1990 return, petitioners reported total income of

$42,326 consisting of the following:

| | |
|---|---|
| Wages and salaries | $34,754[7] |
| Interest | 711 |
| Business income | 6,861 |

In Schedule C of their 1990 return, petitioners reported

$195,300 of gross receipts, $188,439 of expenses, and $6,861 of

profit from the operations of petitioner's sole proprietorship

Charles Harp Construction that they described therein as a

---

[6]  The amount of wages and salaries reported in petitioners' 1989 return is equal to the total of the amounts of wages and salaries reflected in Forms W-2 issued to Ms. Harp for 1989.

[7]  The amount of wages and salaries reported in petitioners' 1990 return is equal to the total of the amounts of wages and salaries reflected in Forms W-2 issued to petitioner and Ms. Harp, respectively, for 1990.

general contracting business.  Petitioners did not report in Schedule C, or elsewhere, in their return for that year income from any business other than Charles Harp Construction.

Petitioners did not include as income in their returns for 1989 and 1990 any portion of K & H's and Ms. Velilla's funds that petitioner deposited into petitioners' accounts during those years.  Nor did they include in their returns for those years any income in connection with the Kabeiseman loans.

The Examination of Petitioners' 1989 and
1990 Returns and the Notice of Deficiency

In June 1993, respondent assigned a revenue agent to examine petitioners' returns for 1989 and 1990.  During the course of that examination, the revenue agent did not have sufficient books or records relating to petitioner's sole proprietorship or petitioners' other financial activities during the years at issue in order to determine whether petitioners had reported in those returns all of their income for those years, nor did petitioners attempt during the course of that examination to re-create any of the books or records relating to their financial activities during the years at issue that they claim were accidentally discarded during 1991.  Consequently, in order to reconstruct petitioners' income for the years at issue, the revenue agent used the bank deposits method under which that agent examined the deposits that were made during those years into petitioners' accounts at various financial institutions.  Based on certain

limited information that the revenue agent was able to obtain
with respect to certain of those deposits, that agent excluded
from the calculation of petitioners' unreported income for those
years those deposits that that agent concluded were not taxable
(e.g., credit card advances) or that that agent concluded had
been reported by petitioners in Schedules C of their 1989 and
1990 returns.[8]

In the notice of deficiency (notice), respondent determined
that deposits into petitioners' accounts during the years 1989
and 1990 in the amounts of $817,214 and $319,904, respectively,
constitute unreported income.  The notice further stated in
pertinent part:

> It is determined that the taxpayer received gross
> income from real estate sales of a general contracting
> business for the tax years 1989 and 1990 which was not
> reported on the returns.  The gross income amounts have
> been reconstructed according to the information avail-
> able, including information from the Washington County

---

[8]  By way of illustration, in reconstructing petitioners' income
for the years at issue on the basis of the bank deposits method,
the revenue agent excluded from the calculation of petitioners'
unreported income for those years the following deposits into
petitioners' account at Washington Federal that that agent con-
cluded were deposits of amounts that were paid to petitioner in
connection with the sales of certain real properties that had
been reported in Schedules C of petitioners' 1989 and 1990 re-
turns:

| Date of Deposit | Amount of Deposit |
| --- | --- |
| Jan. 17, 1989 | $6,970.84 |
| Feb. 22, 1989 | 15,608.58 |
| May  3, 1989 | 14,747.67 |
| June  1, 1989 | 10,794.10 |
| Apr.  3, 1990 | 46,056.93 |

- 18 -

records and information concerning deposits to the bank accounts controlled by the taxpayer. The taxpayer received gross income in the amounts of $ 1,282,614.00 and $ 515,204.00 rather than gross income from contracting of $ 465,400.00 and $ 195,300.00 as reported on the returns for the tax years 1989 and 1990 respectively. It is further determined that the gross income is self-employment income and thus subject to the self-employment tax for the tax years 1989 and 1990.

OPINION

Before the trial herein had commenced but after the Court had received and reviewed the document entitled "Stipulation of Facts" and the exhibits attached thereto that the parties had filed with the Court, the Court expressed its concern to the parties about whether the record was clear as to (1) the concessions, if any, made by the parties after the notice was issued and (2) the amounts of the deposits that remained in dispute as of the commencement of trial. The Court directed the parties to supplement their stipulation of facts in order to clarify those matters, and the parties filed a document entitled "Supplemental Stipulation of Facts". (We shall refer to both the stipulation of facts and the supplemental stipulation of facts as stipulations.)

Upon review of the entire record in this case, we have found certain errors in the stipulations and the briefs as to the amounts of deposits into petitioners' accounts during 1989 and 1990 that remain in dispute. Consequently, we are not bound by those errors in the stipulations, see Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989), and in the briefs.

Taking account of the parties' concessions and the errors that we found in certain stipulations and in the briefs, on the record before us, we find that the amounts of petitioners' unreported income for 1989 and 1990 that remain in dispute are $174,030.35 and $121,061.97, respectively, calculated as follows:

|                                                                                                                                                                                          | 1989            | 1990            |
| ---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------- | --------------- | --------------- |
| Deposits treated as unreported income in the notice . . . . . . .                                                                                                                         | $817,214.29     | $319,904.41     |
| Less concessions by respondent . .                                                                                                                                                       | 640,684.04[9]   | 218,152.64[10]  |
| Less concession by petitioners . .                                                                                                                                                       | 2,500.00[11]    | --              |
| Deposits in the notice that remain in dispute after taking account of concessions by the parties . . . .                                                                                  | 174,030.35      | 101,751.77      |
| Amount of the Kabeiseman loan proceeds deposited during 1989 and not repaid as of Dec. 31, 1990, that respondent contends is income from the discharge of indebtedness                    | --              | 19,310.20       |
| Amounts of unreported income remaining in dispute . . . . . . .                                                                                                                           | 174,030.35      | 121,061.97      |

[9]  Respondent's concessions for 1989 consist of the following deposits into petitioners' accounts during that year:  (1) Deposits of $481,051.62 disbursed from petitioners' accounts as payments to, or on behalf of, K & H, (2) deposits of $29,000 of the Kabeiseman loan proceeds, (3) a deposit of $17,000 of the proceeds of the sale of a promissory note to Mr. Kabeiseman, and (4) other deposits of various items totaling $113,632.42.

[10]  Respondent's concessions for 1990 consist of the following deposits into petitioners' accounts during that year:  (1) Deposits of $56,155.40 disbursed from petitioners' accounts as payments to, or on behalf of, K & H, (2) a deposit of $22,500 of the proceeds of the sale of property known as "Dairy Creek", in which petitioners had a basis of $22,649.60, and (3) other deposits of various items totaling $139,497.24.

[11]  See supra note 5.

On the record before us, we further find that the foregoing amounts of unreported income remaining in dispute for 1989 and 1990 consist of the following items and amounts:[12]

|  | 1989 | 1990 |
|---|---|---|
| Amounts of deposits in the notice that remain in dispute | | |
| (1) Deposits of (a) K & H's construction loan proceeds, checking account funds, and credit line funds and (b) Ms. Velilla's construction loan proceeds and checking account funds . . . . . . . . . . . . | $90,666.35 | $60,168.06 |
| (2) Miscellaneous deposits . . . . | 83,364.00 | 41,583.71 |
| Amount of the Kabeiseman loan proceeds deposited during 1989 and not repaid as of Dec. 31, 1990, that respondent contends is income from the discharge of indebtedness . . . . | -- | 19,310.20 |
| Amounts of unreported income remaining in dispute . . . . . . . . | 174,030.35 | 121,061.97 |

Preliminary Matters

Respondent used the bank deposits method to reconstruct petitioners' income for the years at issue. "A bank deposit is prima facie evidence of income and respondent need not prove a likely source of that income." Tokarski v. Commissioner, 87 T.C.

---

[12] A review of the parties' briefs leads us to conclude that, despite certain errors that we found in the stipulations and briefs, the parties nonetheless agree that the two broad categories of deposits that remain in dispute are the two identified below by the Court and that there also is a dispute regarding whether the $19,310.20 of Kabeiseman loan proceeds that was not repaid as of the end of 1990 constitutes income to petitioners for that year.

74, 77 (1986). Petitioners bear the burden of proving that respondent's determinations of income based on the bank deposits method are erroneous. Clayton v. Commissioner, 102 T.C. 632, 645 (1994); DiLeo v. Commissioner, 96 T.C. 858, 869 (1991), affd. 959 F.2d 16 (2d Cir. 1992). Petitioners may satisfy that burden by establishing that the deposits at issue are not taxable or constitute income that they previously reported. See Calhoun v. United States, 591 F.2d 1243, 1245 (9th Cir. 1978); Marcello v. Commissioner, 380 F.2d 509, 511 (5th Cir. 1967), affg. T.C. Memo. 1964-303; Nicholas v. Commissioner, 70 T.C. 1057, 1064 (1978).

Respondent does not have to show that the deposits at issue are taxable.[13] Respondent nonetheless, through argument at trial and on brief, offers a reason as to why the deposits of K & H's and Ms. Velilla's funds that remain in dispute constitute income, viz., they were deposits of funds misappropriated by petitioner. Respondent also offers a reason, through argument at the conclusion of trial[14] and on brief, as to why the balance of the Kabeiseman loan proceeds that was not repaid as of the end of 1990 (i.e., $19,310.20) constitutes income to petitioners for that year; viz., that balance was forgiven or discharged by Mr.

_____

[13] Respondent must, however, take into account any nontaxable source of a deposit of which respondent has knowledge. Clayton v. Commissioner, 102 T.C. 632, 645-646 (1994).

[14] Respondent conceded at the conclusion of the trial that the funds totaling $29,000 that Mr. Kabeiseman transferred to petitioner and that petitioner deposited into one of petitioners' accounts during 1989 were loans.

Kabeiseman during 1990.

Petitioners assert on brief (1) that respondent's arguments at trial and on brief that petitioners have unreported income for 1989 and 1990 resulting from the deposits of funds misappropriated from K & H and Ms. Velilla and for 1990 resulting from the discharge of the outstanding balances of the Kabeiseman loans raise matters that are not properly before the Court and (2) that, assuming arguendo that such matters were properly before the Court, respondent has the burden of proof as to such matters. To support their assertions, petitioners point out that respondent stated in the notice that certain deposits into petitioners' accounts during the years at issue constitute unreported income for those years from "real estate sales of a general contracting business" or "from contracting", and not from misappropriated funds or the discharge of indebtedness. Respondent disagrees, pointing out, inter alia, that respondent's arguments about which petitioners complain are properly before the Court because petitioners were in no way prejudiced or unfairly surprised by them.

With respect to the parties' disagreement over whether respondent is raising certain matters not properly before this Court, we note initially that, regardless how we resolve that disagreement, petitioners nonetheless bear the burden of proving that all the deposits at issue are not taxable or that they represent income that they previously reported. See <u>Calhoun v.</u>

United States, supra at 1245; Marcello v. Commissioner, supra at 511; Tokarski v. Commissioner, supra at 77.

Turning now to the parties' dispute as to whether respondent is raising certain matters that are not properly before us, it is significant that petitioners do not dispute, and we find on the instant record, that they were not surprised or prejudiced by respondent's arguments at trial and on brief that petitioners have unreported income for 1989 and 1990 resulting from the deposits of misappropriated funds and for 1990 resulting from the discharge of the outstanding balances of the Kabeiseman loans. See Leahy v. Commissioner, 87 T.C. 56, 65 (1986); Estate of Horvath v. Commissioner, 59 T.C. 551, 555 (1973). We further find on that record that those matters were before the Court within the meaning of Rule 41(b)(1). The record before us contains stipulations, joint exhibits, and testimony relevant to those matters, and there is no indication that petitioners had any additional evidence that they did not present at trial with respect thereto. See Leahy v. Commissioner, supra at 64; Fox Chevrolet, Inc. v. Commissioner, 76 T.C. 708, 735-736 (1981). Moreover, with respect to respondent's argument that petitioners have unreported income for 1989 and 1990 resulting from the deposits of misappropriated funds, petitioners' counsel addressed that argument in his opening statement at trial and elicited relevant testimony with respect to it from both petitioner and Mr. Kabeiseman. Furthermore, with respect to respondent's

argument that petitioners have unreported income for 1990 result-
ing from the discharge of the outstanding balances of the
Kabeiseman loans, certain documents in the record indicate that
questions regarding that matter were raised prior to trial by
respondent, after petitioners had informed respondent that
certain deposits totaling $29,000 during 1989 consisted of two
loans that Mr. Kabeiseman had made to petitioner.  On the record
before us, we find that respondent's arguments that petitioners
have unreported income for 1989 and 1990 resulting from the
deposits of misappropriated funds and for 1990 resulting from the
discharge of the outstanding balances of the Kabeiseman loans are
properly before us.

With respect to the parties' disagreement over whether
respondent bears the burden of proof on the two matters in
question, we shall deal with each of those matters separately
because we view them differently.  Although a taxpayer generally
has the burden of proving that respondent's determinations in the
notice of deficiency are erroneous, respondent bears the burden
of proving any new matter that was not raised in that notice.
See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933);
Foster v. Commissioner, 80 T.C. 34, 197 (1983), affd. in part and
vacated in part by 756 F.2d 1430 (9th Cir. 1985).  The assertion
of a new theory that merely clarifies or develops the original
determination without (1) being inconsistent with that determina-
tion, (2) increasing the amount of the deficiency, or (3) requir-

ing the presentation of different evidence is not a new matter

requiring the shifting of the burden of proof to respondent.  See

Seagate Tech., Inc. & Consol. Subs., v. Commissioner, 102 T.C.

149, 169 (1994); Foster v. Commissioner, supra at 197.

On the instant record, we reject petitioners' contention

that respondent raised a matter as to which respondent has the

burden of proof in arguing that petitioners have unreported

income for 1989 and 1990 resulting from the deposits of

misappropriated funds.[15]  During the course of respondent's

examination of petitioners' returns for 1989 and 1990, respondent

did not have adequate books or records to determine whether

---

[15]  Petitioners rely on dicta in Big "D" Development Corp. v. Commissioner, T.C. Memo. 1971-148, affd. 453 F.2d 1365 (5th Cir. 1972), to support that contention.  That case held that, under the facts presented, respondent had not raised a matter as to which respondent had the burden of proof because "respondent merely narrowed an issue after taking a broad position in the statutory notice."  The Court further stated in dicta in that case on which petitioners rely that "It would be otherwise where respondent's determination in a statutory notice is narrowly drawn and, after the matter has been petitioned to this Court, respondent advances new grounds not directly or implicitly within the ambit of the determination made in the notice." Id.  That language does not in any way indicate that in cases, such as the instant case, where respondent (1) reconstructs a taxpayer's income by using the bank deposits method, (2) determines in the notice of deficiency, based on the application of that method, that certain deposits constitute income, and (3) sets forth her assumption therein as to the source of that income, respondent necessarily is advancing "new grounds not directly or implicitly within the ambit of the determination made in the notice", id., when she thereafter argues that a portion of those deposits is income from a source different from that assumed in the notice of deficiency.

petitioners had reported all of their income for those years.[16] Consequently, respondent had to reconstruct petitioners' income for those years.  Under such circumstances, petitioners generally will be "held accountable for any imprecision in the language employed in the notice of deficiency and for any procedural or evidentiary consequences flowing therefrom."  Beck v. Commissioner, 74 T.C. 1534, 1549 (1980).

In the present case, respondent's determination in the notice was that, under the bank deposits method, petitioners have unreported income for the years at issue.  In such a case, it is well established that (1) the deposits into petitioners' accounts during the years at issue are prima facie evidence of income; (2) respondent is not required to prove a likely source for that income; and (3) petitioners are required to establish that the deposits at issue are not taxable or that they represent income that they previously reported.  See Calhoun v. Commissioner, 591 F.2d at 1245; Marcello v. Commissioner, 380 F.2d at 511; Clayton v. Commissioner, 102 T.C. at 645; Tokarski v. Commissioner, 87

---

[16]  Around the time the petition was filed in May 1994, several months after respondent mailed the notice to petitioners, petitioners prepared certain schedules that purport to identify (1) the sources of certain deposits made into petitioners' accounts during each of the years at issue (petitioners' schedules of deposits) and (2) certain expenses paid from those accounts during each such year (petitioners' schedules of expenses).  Petitioners claim that petitioners' accountant, Mr. Bernard, worked with them in preparing those schedules.  The nature and the extent of any such work by Mr. Bernard, whom petitioners did not call as a witness, are not disclosed by the record.

T.C. at 77. Neither respondent's statement in the notice as to the assumed source for the deposits that she determined to be income on the basis of the bank deposits method nor respondent's argument at trial and on brief that petitioners have unreported income for 1989 and 1990 resulting from the deposits of misappropriated funds alters those principles.

Respondent's statement in the notice of her assumption as to the source (i.e., "real estate sales of a general contracting business" or "from contracting") for the deposits that she determined constitute unreported income was not part of, and was not essential to, respondent's theory in the notice that, under the bank deposits method, all money deposited into petitioners' accounts during 1989 and 1990 constitutes income (except money so deposited that respondent knows (1) is not taxable or (2) is income that petitioners previously reported in their returns for those years). Clayton v. Commissioner, supra at 645-646; DiLeo v. Commissioner, 96 T.C. at 868. Respondent's argument at trial and on brief that petitioners have unreported income for 1989 and 1990 resulting from the deposits of misappropriated funds is not inconsistent with, and merely serves to develop, that theory.

We view differently petitioners' contention that respondent raised a matter as to which respondent bears the burden of proof in arguing at trial and on brief that petitioners have unreported income for 1990 from the discharge of the outstanding balances of the Kabeiseman loans. For the reasons stated above, petitioners

bear the burden of proving that the deposits into their accounts during 1989 and 1990 do not constitute unreported income. Respondent conceded at the conclusion of the trial herein that petitioners had satisfied that burden with respect to the deposits of the Kabeiseman loans during 1989. Respondent, however, advanced as an alternative argument in her opening statement and as the sole argument at the conclusion of the trial herein and on brief a new theory as to why petitioners have $19,310.20 of unreported income for 1990, viz., unreported income resulting from the discharge or forgiveness by Mr. Kabeiseman during that year of the outstanding balances of the Kabeiseman loans (viz., $19,310.20). That new theory does not merely serve to develop respondent's theory in the notice that, under the bank deposits method, all money deposited into petitioners' accounts during 1990 constitutes unreported income for that year (except money so deposited that respondent knows (1) is not taxable or (2) is income that petitioners previously reported in their return for that year). Accordingly, on the record before us, we sustain petitioners' contention that respondent has raised a matter as to which she bears the burden of proof in arguing that petitioners have unreported income for 1990 resulting from the discharge of the outstanding balances of the Kabeiseman loans.[17]

---

[17] We note that on the record before us our findings and conclusions with respect to respondent's argument that petitioners have unreported income for 1990 resulting from the discharge of the

(continued...)

Deposits of K & H's Construction Loan
Proceeds, Checking Account Funds, and
Credit Line Funds and Ms. Velilla's
Construction Loan Proceeds and
Checking Account Funds

The parties agree that (1) during 1989, petitioner deposited into one of petitioners' accounts K & H's funds totaling $544,323.97; (2) during 1989, petitioner deposited into one of petitioners' accounts Ms. Velilla's construction loan proceeds totaling $27,394; (3) during 1990, petitioner deposited into two of petitioners' accounts K & H's funds totaling $81,570.46; (4) during 1990, petitioner deposited into one of petitioners' accounts Ms. Velilla's funds totaling $34,753; (5) petitioners' 1989 and 1990 returns did not include any portion of the foregoing deposits as income; (6) during 1989 and 1990, petitioners made certain payments from their accounts to, or on behalf of, K & H; and (7) to the extent that during 1989 and 1990 petitioners made payments to, or on behalf of, K & H or Ms. Velilla, the aggregate amount of such payments during each such year should reduce the aggregate amount of the foregoing deposits during each such year.  The only disagreements between the parties with respect to the deposits during 1989 and 1990 of K & H's funds and Ms. Velilla's funds are (1) whether the aggregate amount of those deposits during each such year exceeded the aggregate amount of

[17](...continued)
outstanding balances of the Kabeiseman loans would remain the same regardless who bears the burden of proof with respect to that argument.

the payments made to, or on behalf of, K & H and Ms. Velilla during each such year; and (2) whether any such deposits not disbursed as payments to, or on behalf of, K & H and Ms. Velilla (deposits that were not returned) are taxable and thus includible in petitioners' income for each such year.[18]

With respect to the first dispute between the parties as to whether the aggregate amount of the deposits into petitioners' accounts during 1989 and 1990 of K & H's funds and Ms. Velilla's funds exceeded the aggregate amount of the payments made to, or on behalf of, K & H and Ms. Velilla during each of those years,

---

[18] Respondent contends on brief (1) that the stipulated payments to, or on behalf of, K & H do not include any payments to, or on behalf of, Ms. Velilla and (2) that the deposits that were not returned consist of (a) all of Ms. Velilla's funds and (b) an unidentified portion of the aggregate amount of the deposits of K & H's funds. Petitioners disagree and make no such distinctions on brief with respect to K & H's funds and Ms. Velilla's funds. As we understand petitioners' position, they maintain that any payments made during the years at issue from Ms. Velilla's funds that petitioner deposited into one of petitioners' accounts would have been included as part of the payments that they made during those years to, or on behalf of, K & H. We therefore construe and treat petitioners' assertions on brief with respect to any payments that they claim they made during the years at issue to, or on behalf of, K & H as assertions that such payments were payments to, or on behalf of, not only K & H, but also Ms. Velilla. Since K & H contracted to build a house for Ms. Velilla and was responsible for the costs incurred in connection with the construction of that house, the payments that petitioners made during the years at issue to, or on behalf of, K & H could have included, as petitioners suggest, payments of some or all of Ms. Velilla's funds that were deposited into one of petitioners' accounts during those years. However, the record before us does not enable us to identify (1) the nature of the payments made to, or on behalf of, K & H, (2) the source of the deposits that were used to make those payments, or (3) the source of the deposits that were not returned.

the parties stipulated as follows:

> 24. Petitioners made the following paryments [sic] in 1989:
>
> > $474,467.56    Payments to Corporation
> >   6,584.06    Payments of Corporate Expenses
>
> > *    *    *    *    *    *    *
>
> 27. Petitioners made the following payments in 1990:
>
> > $52,462.00    Payments to Corporation
> >  3,693.40    Payments of Corporate Expenses

Under the foregoing unqualified stipulations, the parties have agreed that during 1989 and 1990 petitioners made payments to, or on behalf of, K & H in the amounts of $481,051.62 and $56,155.40, respectively.

On brief, petitioners appear to maintain that the foregoing stipulations set forth the minimum payments that they made and that they made additional payments during those years to, or on behalf of, K & H and Ms. Velilla that increased the aggregate amounts of such payments for 1989 and 1990 to $529,023.92 and $89,643.25, respectively.[19] To support their contention, they rely on (1) petitioners' schedules of expenses and (2) Ms. Harp's testimony. Respondent disputes petitioners' contention.

---

[19] Contrary to petitioners' position on brief, petitioner testified that the aggregate amount of the deposits into petitioners' accounts during each of the years at issue of K & H's funds and Ms. Velilla's funds were used to make payments to, or on behalf of, K & H and Ms. Velilla. We question the reliability of that testimony. Petitioner's testimony on that point also is inconsistent with petitioners' schedules of expenses that purport to show that only a portion of those deposits were used to make payments to, or on behalf of, K & H and Ms. Velilla.

We are unwilling to accept either petitioners' schedules of expenses or Ms. Harp's testimony as reliable evidence to support petitioners' contention.  Petitioners' schedules of expenses, like Ms. Harp's testimony about those schedules, are nothing more than self-serving statements that the additional disbursements from petitioners' accounts during the years at issue that are reflected in those schedules were made to, or on behalf of, K & H and Ms. Velilla.  Neither petitioners' schedules of expenses nor Ms. Harp's testimony, which we found to be general, vague, conclusory, and at times internally inconsistent, persuade us that those additional disbursements were, in fact, made to, or on behalf of, K & H and Ms. Velilla, rather than in payment of petitioners' expenses.[20]  In this connection, Ms. Harp testified that petitioners' schedules of expenses were prepared in reliance on copies that petitioners were able to obtain of certain supplier bills and canceled checks, which, she claims, indicated thereon the purposes for which certain disbursements from

---

[20]  We note that, with respect to $9,689.80 of the additional disbursements that petitioners claim they made during 1990 to, or on behalf of, K & H and Ms. Velilla, they also claim that they paid that same amount during that same year to Mr. Kabeiseman in partial repayment of the $29,000 in Kabeiseman loans that petitioner received in 1989.  The record establishes that the payments totaling $9,689.80 that petitioners made during 1990 were made to Mr. Kabeiseman in partial repayment of the Kabeiseman loans.  Thus, not only are petitioners wrong in contending that those payments were made to, or on behalf of, K & H and Ms. Velilla, they are counting those payments twice, once in advancing their argument with respect to the Kabeiseman loans and once in advancing their argument with respect to the deposits of K & H's and Ms. Velilla's funds.

petitioners' accounts were made during the years at issue.[21] However, petitioners did not attempt to introduce those documents into evidence. Nor did they proffer as a witness their accountant, Mr. Bernard, who purportedly assisted petitioners with the preparation of those schedules.

On the record before us, we find that during 1989 and 1990 petitioners made payments to, or on behalf of, K & H in the amounts of $481,051.62 and $56,155.40, respectively. We further find on that record that the aggregate amount of deposits into petitioners' accounts during 1989 and 1990 of K & H's and Ms. Velilla's funds exceeded the payments that petitioners made to, or on behalf of, K & H and Ms. Velilla during each of those years by $90,666.35 and $60,168.06, respectively.

With respect to the second dispute between the parties as to whether the deposits that were not returned are includible in

---

[21] Petitioners claim that certain other records and books, which related to petitioner's sole proprietorship and petitioners' other financial activities during the years at issue and which would have assisted them in preparing petitioners' schedules of expenses and petitioners' schedules of deposits, were accidentally discarded during 1991 and that they had difficulty in obtaining certain bank records from Washington Federal that would have assisted them in preparing those schedules. Assuming arguendo that petitioners' books and records were, in fact, accidentally discarded and that they had difficulty in obtaining certain records from Washington Federal, petitioners would still have to satisfy their burden of proof. See Malinowski v. Commissioner, 71 T.C. 1120, 1125 (1979). Under such circumstances, petitioners would be able to meet that burden by presenting reliable secondary evidence. Id. As stated above, we did not find petitioners' schedules of expenses or Ms. Harp's testimony regarding those schedules to be reliable.

petitioners' income for each of the years at issue, as we stated above, the deposits at issue are prima facie evidence of income, and petitioners bear the burden of proving that those deposits are not taxable.[22]  See Calhoun v. United States, 591 F.2d at 1245; Marcello v. Commissioner, 380 F.2d at 511; Tokarski v. Commissioner, 87 T.C. at 77.  As we understand petitioners' position, they contend that no portion of the deposits into petitioners' accounts of (1) K & H's construction loan proceeds, checking account funds, and credit line funds and (2) Ms. Velilla's construction loan proceeds and checking account funds is includible in their income for each of the years 1989 and 1990 because petitioners held those deposits "for corporate purposes and subject to an obligation which Mr. Harp recognized to return the funds to the corporation."  Respondent disagrees with those contentions, arguing that those deposits represent funds misappropriated by petitioner and that, to the extent that during each of the years at issue petitioners did not use those deposits during each such year to make payments to, or on behalf of, K & H and Ms. Velilla, they are taxable to petitioners under the principles of James v. United States, 366 U.S. 213 (1961).

Regardless whether petitioner's actions during the years at issue regarding K & H's and Ms. Velilla's funds are characterized

---

[22]  As noted above, the parties agree that petitioners' returns for 1989 and 1990 did not include as income any of the deposits during each of those years of K & H's and Ms. Velilla's funds.

as a misappropriation, those deposits may nonetheless constitute income to petitioners. Section 61(a) defines gross income to include income from whatever source derived, including all accessions to wealth over which a taxpayer has complete dominion. Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). A taxpayer must include in gross income funds obtained "lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition". James v. United States, supra at 219. Funds so obtained are includible in the taxpayer's income even though the taxpayer may still be required to return such funds.[23] Id.

On the record before us, we reject petitioners' contention that they held for corporate (i.e., K & H's) purposes the deposits of K & H's and Ms. Velilla's funds. To support their contention with respect to the deposits at issue of K & H's funds, petitioners rely on petitioner's testimony and the stipulations that petitioners made certain payments to, or on behalf of, K & H during each of the years at issue.[24] We question the

---

[23] A taxpayer's income is reduced for any year by the amount of funds that were obtained by the taxpayer and included in the taxpayer's income under the principles of James v. United States, 366 U.S. 213 (1961), and that the taxpayer repays in such year.

[24] Although petitioners suggest on brief that certain financial transactions may have taken place during 1991 between petitioner and K & H that impact resolution of the issue whether petitioners have unreported income for each of the years 1989 and 1990 resulting from the deposits that were not returned during each of those years, neither petitioner nor Mr. Kabeiseman testified
(continued...)

reliability of petitioner's testimony.  It was not only self-serving, but it also was at times inconsistent with other evidence in the record.  As for the stipulations about petitioners' payments to, or on behalf of, K & H, we do not believe those stipulations necessarily support, let alone conclusively prove, petitioners' contention that during the years at issue they were holding K & H's funds for K & H's purposes.[25]  Indeed, the record (1) shows that petitioner was not even authorized to deposit K & H's construction loan proceeds into petitioners' accounts during those years and (2) is silent as to (a) whether petitioner was authorized to deposit K & H's checking account and credit line funds into petitioners' accounts;[26] (b) whether or how such funds were disbursed during each of the years at issue; and (c) whether petitioners were authorized to retain any portion of such funds

---

[24](...continued)
about the nature of any such transactions.

[25]  Under petitioners' contention, funds otherwise includible in a taxpayer's income under the principles of James v. United States, supra, would never be so included as long as such funds are ultimately repaid.  That is because, according to petitioners, repayment shows that the taxpayer was holding the funds for the purposes of the person from whom they were obtained.

[26]  We find it hard to believe that petitioner would have been authorized to deposit into petitioners' accounts funds from K & H's checking account and credit line or to retain any portion of those funds for petitioners' own use when he was not authorized to deposit K & H's construction loan proceeds into their accounts or to retain any portion of those deposits for their own use.

during each of those years.[27]

With respect to the deposits at issue of K & H's construction loan proceeds, the record establishes that Mr. Kabeiseman did not at any time during the years at issue (1) authorize petitioner to deposit such proceeds into petitioners' accounts, (2) know the amounts of such proceeds that petitioner so deposited, (3) authorize petitioner's practice of retaining a portion of such proceeds during each of those years and not using such portion to make payments to, or on behalf of, K & H, or (4) know the amounts of such proceeds that petitioner retained.

We find petitioners' apparent reliance on the following testimony of Mr. Kabeiseman, in order to establish that the deposits at issue of the K & H construction loan proceeds were authorized, to be misplaced:

    Q    Mr. Kabeiseman, you were aware of the * * *
    deposit of the loan draws to Mr. Harp's personal ac-
    count?

    A    From Kabeiseman & Harp construction loans,
    yes, uh-huh.

We are unable to find that the foregoing testimony establishes that Mr. Kabeiseman authorized petitioner to deposit K & H's construction loan proceeds into petitioners' accounts during the

---

[27] Although Mr. Kabeiseman was generally responsible for preparing K & H's checks to pay for corporate expenditures, the record does not show whether petitioner obtained the funds from the K & H checking account that he deposited into petitioners' accounts through actual checks drawn on that account or, if so, whether Mr. Kabeiseman prepared, or was otherwise aware of, any such K & H checks that were issued to petitioner.

years at issue or to retain a portion of such proceeds during each of those years. The record establishes, and we have found as facts, that it was only in May or June 1989, after petitioner had made the first few deposits of those loan proceeds, that Mr. Kabeiseman became aware that petitioner had made those deposits. As soon as he became aware that petitioner was depositing K & H's construction loan proceeds into petitioners' account at Washington Federal, Mr. Kabeiseman disapproved of what petitioner had done. Specifically, Mr. Kabeiseman advised petitioner at that time that petitioner's deposits of K & H's construction loan proceeds into petitioners' account at Washington Federal was not a good accounting practice, that Mr. Kabeiseman was unable to trace to any particular construction loan account of K & H the direct payments that petitioner had made to it during May or June 1989 of certain of its construction loan proceeds, that petitioner should direct Washington Federal to issue checks directly to K & H for the K & H construction loan proceeds sought in the draw requests that petitioner made, and that such checks should be deposited into K & H's checking account. Petitioner nonetheless continued to deposit K & H's construction loan proceeds into petitioners' account at Washington Federal after May or June 1989 and through July 1990, even after he ceased in the spring of 1990 being actively involved in the operations of K & H. Moreover, although petitioner testified that he obtained those loan proceeds from Washington Federal in order to pay the

costs incurred in connection with K & H's construction projects, he was unable to explain why he did not immediately remit the entire amount of such proceeds to, or immediately expend them for the benefit of, K & H.

With respect to the deposits at issue of Ms. Velilla's funds, except for petitioner's self-serving, general, and conclusory testimony on which we are unwilling to rely, there is no evidence in the record that supports petitioners' contention that those funds were held for corporate (i.e., K & H's) purposes. The record does not even show whether or how those funds were disbursed during each such year. What the record does establish is that, with respect to the deposits at issue of Ms. Velilla's construction loan proceeds, the contractor agreement between Ms. Velilla and K & H did not authorize petitioner (1) to deposit such proceeds into petitioners' accounts or (2) to retain any portion of such proceeds for petitioners' own purposes. That agreement specifically provided that disbursements from Ms. Velilla's construction loan account were to be made "only to pay for costs of labor on and materials for the Project pursuant to plans and specifications submitted to and approved by Lender." With respect to the deposit at issue of Ms. Velilla's checking account funds, the record is silent regarding whether that deposit was authorized and whether petitioners were authorized to

retain any portion of those funds during 1990.[28]

On the record before us, we also reject petitioners' contention that they held the deposits of K & H's and Ms. Velilla's funds subject to an obligation that petitioner recognized to return the funds so deposited to K & H.  That record does not establish that petitioner recognized an obligation to return those funds to K & H.  Nor does it show that petitioner recognized an obligation to return Ms. Velilla's funds to Ms. Velilla. It is significant that:  (1) Petitioner did not disclose to Mr. Kabeiseman the amounts of the K & H construction loan proceeds that petitioner deposited into petitioners' account at Washington Federal or the amounts of those proceeds that he did not return to K & H; (2) the record does not show that petitioner disclosed to Mr. Kabeiseman that he was depositing K & H checking account or credit line funds into petitioners' accounts, the specific amounts so deposited, or the specific amounts of such funds not returned; (3) the record does not establish that petitioner disclosed to Ms. Velilla that he was depositing Ms. Velilla's construction loan proceeds and checking account funds into petitioners' account at Washington Federal, the specific amounts so deposited, or the specific amounts of such proceeds and funds

---

[28]  We find it hard to believe that petitioner would have been authorized to deposit Ms. Velilla's checking account funds into petitioners' accounts or to retain any portion of those funds for petitioners' own use when he was not authorized to deposit Ms. Velilla's construction loan proceeds into their accounts or to retain any portion of those proceeds for their own use.

not returned; (4) the record contains no evidence of any action taken by petitioner at the time of the deposits of K & H's and Ms. Velilla's funds that acknowledged his obligation to return those funds; (5) the record contains no evidence indicating that petitioner kept a contemporaneous accounting or record of (a) the amounts and sources of the deposits that he made into petitioners' accounts during the years at issue or (b) the amounts of those deposited funds, if any, that were used to make payments to, or on behalf of, K & H and Ms. Velilla; and (6) petitioners retained during each year at issue an unidentified portion of the aggregate amount of K & H's and Ms. Velilla's funds that petitioner deposited during each such year and did not use those retained funds to make payments to, or on behalf of, K & H and/or Ms. Velilla.

Even assuming arguendo that we were to find on the instant record that petitioner had recognized an obligation to return K & H's and Ms. Velilla's funds that petitioner deposited into petitioners' accounts during the years at issue, petitioner's unilateral recognition of such an obligation would be insufficient to cause those deposits to be excluded from petitioners' income for the years at issue. See Moore v. United States, 412 F.2d 974, 979-980 (5th Cir. 1969). A taxpayer who obtains funds without a consensual recognition, expressed or implied, of an obligation to repay them and without any restriction as to their disposition must include such funds in gross income. James v.

United States, 366 U.S. at 219; Mais v. Commissioner, 51 T.C. 494, 498 (1968). In order for funds obtained from another person to qualify for exclusion from income because the taxpayer was in essence a borrower from that person who was in essence a lender, there must be an "agreement between the [lender] and borrower entailing 'consensual recognition' of an obligation to repay and exact conditions of repayment." Moore v. United States, supra at 979-980. Such consensual recognition requires that there be mutual consent. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603. Petitioners do not even claim, and the record does not support a finding that, petitioner entered into such an agreement with either K & H or Ms. Velilla.

Based on our review of the entire record before us, we find that petitioners have failed to establish that the deposits of K & H's funds and Ms. Velilla's funds during each of the years 1989 and 1990 that were not returned during each of those years, viz., deposits of $90,666.35 and $60,168.06 during 1989 and 1990, respectively, are not taxable to petitioners.[29]

---

[29] Petitioners also argue that no portion of K & H's funds that petitioner deposited into petitioners' accounts during the years at issue is income to petitioners because (1) in the lawsuit that Mr. Kabeiseman instituted around 1991 against petitioner, Mr. Kabeiseman made no allegation of misappropriation; and (2) the settlement payment of $37,500 by petitioner to Mr. Kabeiseman in connection with that lawsuit encompassed a payment in settlement of any such dispute between Mr. Kabeiseman and petitioner. We disagree. On the record before us, we find that the omission of
(continued...)

Miscellaneous Deposits

The parties agree that the total amounts of miscellaneous deposits that remain at issue for 1989 and 1990 are $83,364 and $41,583.71, respectively. Petitioners agree that those deposits are prima facie evidence of income and that they bear the burden of proving that respondent's determinations of unreported income for the years 1989 and 1990 based on those deposits are erroneous. See Clayton v. Commissioner, 102 T.C. at 645; DiLeo v. Commissioner, 96 T.C. at 869; Tokarski v. Commissioner, 87 T.C. at 77.

Although petitioners' argument is not altogether clear, they appear to argue that the miscellaneous deposits at issue for 1989 and 1990 do not constitute unreported income for those years because they represent gross receipts derived from the operations of petitioner's sole proprietorship Charles Harp Construction that petitioners reported in Schedule C of their return for each

---

[29](...continued)
such an allegation from the complaint in the lawsuit does not establish that those funds are not taxable to petitioners. In fact, with respect to petitioner's deposits during 1989 and 1990 of K & H's construction loan proceeds, the record does not indicate that Mr. Kabeiseman had any knowledge at any time throughout the course of the years at issue of petitioner's practice of retaining a portion of those proceeds. Even assuming arguendo that we were to construe the settlement agreement as encompassing a repayment of a portion of K & H's construction loan proceeds, a repayment by petitioner in a year subsequent to the year in which those proceeds were deposited into petitioners' accounts and for which they constitute income to petitioners under the principles of James v. United States, 366 U.S. 213 (1961), would not reduce petitioners' income for the year during which those proceeds were deposited. See Mais v. Commissioner, 51 T.C. 494, 499 (1968).

of those years.  Petitioners appear to argue further that, to the extent that respondent did not treat those deposits as having been so included, her computation of unreported income, based on the application of the bank deposits method, is inaccurate.

If petitioners believe that respondent's method of computation of unreported income is unfair or inaccurate, the burden is on them to show such unfairness or inaccuracy.  Price v. United States, 335 F.2d 671, 677 (5th Cir. 1964).  In applying the bank deposits method, respondent is not required to make an automatic adjustment for amounts reported in the taxpayer's return if the taxpayer fails to show that the reported amounts were in fact used to make such deposits.  See Marcello v. Commissioner, 380 F.2d at 511.  Based on certain limited information that respondent's revenue agent found reliable, that agent excluded from the calculation of petitioners' unreported income those deposits that that agent concluded had been reported income in petitioners' 1989 and 1990 returns.[30]  Based upon certain additional information that petitioners provided to respondent subsequent to the issuance of the notice and prior to the trial herein, respondent reduced the amount of petitioners' unreported income for the years at issue that she had determined in the notice on the basis of the bank deposits method in order to reflect certain deposits into petitioners' accounts during those years that respondent

---

[30]   See supra note 8.

concluded had been included as income in petitioners' 1989 and 1990 returns. Petitioners presented no evidence at trial that establishes that the miscellaneous deposits at issue for each of the years 1989 and 1990 were in fact included in the gross receipts that were reported in Schedule C of their return for each of those years.

On the instant record, we find that petitioners have failed to establish that the miscellaneous deposits at issue represent income that they reported in their returns for those years.

Petitioners assert additional reasons for claiming that the following two miscellaneous deposits do not constitute income: (1) A deposit of $6,222.89 on May 30, 1989, into petitioners' account at the Hillsboro branch of Washington Federal[31] that petitioners claim they obtained from an account at Far West Federal and (2) a deposit of $1,630.11 on May 2, 1990, into petitioners' account at that bank that petitioners obtained from the sale of a 1988 Chevrolet pickup truck.[32]

---

[31] Although the parties stipulated, and petitioners assert on brief, that that deposit was a "Transfer to Far West Bank", we shall disregard that stipulation, see Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989), and that assertion because they are clearly contrary to facts disclosed by the record. The following facts are disclosed by the record: (1) A deposit of $6,222.89 was made into petitioners' account at Washington Federal on May 30, 1989; and (2) no deposit in that amount was made into petitioners' account at Far West Federal on May 30, 1989, or on any other date during 1989.

[32] Petitioners advance no additional arguments, and the record does not support a finding, that the remaining miscellaneous
(continued...)

With respect to the deposit of $6,222.89 on May 30, 1989, petitioners' bank statement from Far West Federal does not show that a transfer of $6,222.89 was made from their account at that bank to their account at Washington Federal in or around May 1989. Assuming arguendo that the source of the $6,222.89 deposit on May 30, 1989, into petitioners' account at Washington Federal was a transfer from an account at Far West Federal, the record does not contain any evidence as to the account at Far West Federal from which that transfer may have been made or the purpose of such transfer.

With respect to the deposit of $1,630.11 on May 2, 1990, petitioners rely on the general and vague testimony of petitioner that that deposit represented proceeds from the sale of a truck that petitioners sold at a loss. The record contains no evidence relating to the cost of that truck or its basis in petitioners' hands at the time of its sale.

On the instant record, we find that petitioners have failed

---

32(...continued)
deposits at issue are not taxable. In this regard, assuming arguendo that we were to find petitioners' schedules of deposits and Ms. Harp's testimony regarding those schedules to be reliable, we found neither those schedules nor that testimony helpful in determining whether those deposits are not taxable. Petitioners' schedules of deposits either do not identify the sources of certain of the miscellaneous deposits at issue or identify the sources of certain of those deposits without providing petitioners' explanation as to why they are not taxable. Ms. Harp's testimony regarding petitioners' schedules of deposits, which was general, vague, and conclusory, did not provide any additional explanation on behalf of petitioners as to why the miscellaneous deposits at issue for each of the years at issue are not taxable.

to establish that the foregoing two miscellaneous deposits at issue are not taxable.

Based on our review of the entire record before us, we find that petitioners have failed to establish that they do not have unreported income resulting from the miscellaneous deposits at issue for the years 1989 and 1990 in the amounts of $83,364 and $41,583.71, respectively.[33]

### Deposits of Funds that Mr. Kabeiseman Transferred to Petitioner

The parties agree that (1) on January 18, 1989, and on February 7, 1989, petitioner deposited into one of petitioners' accounts loans obtained from Mr. Kabeiseman in the amounts of $25,000 and $4,000, respectively; and (2) during 1990, petitioner made payments totaling $9,689.80 to Mr. Kabeiseman with respect to those loans. In addition, the parties do not dispute that petitioner did not make any other payments with respect to those loans to Mr. Kabeiseman. The only dispute is whether Mr. Kabeiseman discharged the respective outstanding balances of those loans during 1990.

Section 61(a)(12) provides that gross income generally includes income from the discharge of indebtedness. A debt is discharged at the point in time at which an identifiable event occurs that makes it clear that the debt will never be paid.

---

[33] We have considered all of petitioners' other arguments with respect to the miscellaneous deposits at issue and find them to be without merit.

Cozzi v. Commissioner, 88 T.C. 435, 445 (1987). The test for determining that point in time depends on a practical assessment of all the facts and circumstances relating to the likelihood of payment. Id.

Petitioners contend that no identifiable event occurred during 1990 that made it clear that the Kabeiseman loans at issue would never be repaid and that therefore petitioners were not discharged from those debts during 1990 and have no income from the discharge of indebtedness for that year. Respondent disagrees.

On the instant record, we find that no identifiable event occurred during 1990 that made it clear that petitioner never would repay the respective outstanding balances of the Kabeiseman loans. Indeed, the record establishes that during that year petitioner repaid $9,689.80 of those loans.

Based on our review of the record before us, we find that the respective outstanding balances of the Kabeiseman loans were not discharged during 1990. Consequently, petitioners do not have income for that year from the discharge of indebtedness.

Self-Employment Tax

Respondent determined that petitioners are liable for self-employment tax for the years 1989 and 1990 because the unreported income for those years is self-employment income. Section 1401 imposes a self-employment tax on self-employment income. Section 1402(b) generally defines self-employment income

as net earnings from self-employment derived by an individual. The term "net earnings from self-employment" means gross income derived by an individual from any trade or business carried on by such individual, less the deductions allowed by the Code that are attributable to such trade or business, plus certain items not relevant here.  Sec. 1402(a).  The term "trade or business", for purposes of the self-employment tax, generally has the same meaning as it has for purposes of section 162.  Sec. 1402(c).

Petitioners contend that assuming arguendo that we were to sustain respondent's positions that petitioners have unreported income for 1989 and 1990 resulting from the deposits of K & H's and Ms. Velilla's funds and for 1990 resulting from the discharge of the outstanding balances of the Kabeiseman loans, such income would not be subject to self-employment tax.  According to petitioners, any such income does not constitute self-employment income because it is not gross income derived from a trade or business carried on by petitioner.  Since we have found that petitioners do not have unreported income for 1990 resulting from the discharge of the outstanding balances of the Kabeiseman loans, we shall address petitioners' contention regarding respondent's determinations of self-employment tax for the years at issue only insofar as that contention relates to our findings that petitioners have unreported income for 1989 and 1990 resulting from the deposits of K & H's and Ms. Velilla's funds.  Respondent does not address that issue in her opening brief, nor does she respond to

petitioners' argument with respect to that issue in her answering brief. Accordingly, we conclude that respondent has conceded the self-employment tax issue relating to that unreported income.[34] See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).

Petitioners do not dispute, and we therefore assume that they concede, that if we were to sustain respondent's determinations of petitioners' unreported income for 1989 and 1990 resulting from the miscellaneous deposits at issue, respondent's determinations imposing self-employment tax for those years on that unreported income would be correct. In light of that concession and our findings that petitioners have unreported income resulting from the miscellaneous deposits at issue for the years 1989 and 1990 in the amounts of $83,364 and $41,583.71, respectively, we sustain respondent's determinations that such income constitutes self-employment income that is subject to self-employment tax.[35]

---

[34] Even assuming arguendo that respondent had not conceded that issue, we agree with petitioners that their unreported income for 1989 and 1990 resulting from the deposits of K & H's and Ms. Velilla's funds is not gross income derived by petitioner from a trade or business, see generally Mannette v. Commissioner, 69 T.C. 990, 992-993 (1978); Hankins v. United States, 403 F. Supp. 257, 259 (N.D. Miss. 1975), affd. without published opinion 531 F.2d 573 (5th Cir. 1976), and that, consequently, it does not constitute self-employment income for either of the years at issue that is subject to self-employment tax.

[35] Petitioners do not dispute, and we assume that they also concede, the imposition of the self-employment tax for 1989 relating to their unreported income for that year in the amount of $2,500 from the sale of plans.

Accuracy-Related Penalty

Respondent determined that petitioners are liable for each of the years 1989 and 1990 for the accuracy-related penalty under section 6662(a) because petitioners' underpayment of tax for each of those years was due to negligence or disregard of rules or regulations. In the alternative, respondent determined that petitioners are liable for that penalty for each of the years at issue because they have a substantial understatement of income for each of those years.

Petitioners contend that assuming arguendo that we were to sustain respondent's position that petitioners have unreported income for 1990 resulting from the discharge of the outstanding balances of the Kabeiseman loans, we should nonetheless reject respondent's determination imposing the accuracy-related penalty for 1990 to the extent that it relates to the underpayment attributable to any such unreported income. In light of our holding that petitioners do not have unreported income for 1990 resulting from the discharge of the outstanding balances of the Kabeiseman loans, we shall not address that contention.

Petitioners do not dispute, and we therefore assume that they concede, that if we were to sustain respondent's position that petitioners have unreported income for 1989 and 1990 result-ing from the deposits of K & H's and Ms. Velilla's funds and the miscellaneous deposits at issue, respondent's determination of the accuracy-related penalty for each of those years to the ex-

tent that it relates to the underpayment attributable to that income would be correct.  In light of that concession and our findings that petitioners have unreported income for 1989 and 1990 resulting from those deposits in the total amount of $174,030.35 and $101,751.77, respectively, we sustain respondent's determination imposing the accuracy-related penalty for each of those years to the extent that it relates to the underpayment for each such year attributable to such unreported income.[36]

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.

---

[36]  Petitioners do not dispute, and we assume that they also concede, the imposition of the accuracy-related penalty for 1989 relating to their unreported income for that year in the amount of $2,500 from the sale of plans.