T.C. Memo. 2020-15

UNITED STATES TAX COURT

UGORJI TIMOTHY WILSON ONYEANI, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15303-16.                    Filed January 16, 2020.

Ugorji Timothy Wilson Onyeani, pro se.

Sarah E. Sexton Martinez, Eugene A. Kornel, and Megan E. Heinz, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge: During the first quarter of 2015 petitioner received about $750,000 from entities allegedly seeking to purchase Nigerian crude oil. Shortly thereafter he attempted to wire $300,000 to a foreign bank. The U.S. Secret Service flagged the transaction and alerted the Internal Revenue Service (IRS or re-

[*2] spondent).  Believing that petitioner intended "quickly to depart from the United States or to remove his property therefrom," the IRS made a termination assessment under section 6851(a).[1]  Performing a bank deposits analysis, the IRS determined that petitioner had received taxable income of $802,083 as of May 13, 2015.  It terminated his taxable year as of that date, assessed tax of $288,546, and collected that sum by levy on his bank account following his unsuccessful challenge to the termination assessment in Federal District Court.  See Onyeani v. United States, No. 15-C-05917, 2016 WL 3149729 (N.D. Ill. June 3, 2016).

Petitioner filed a timely Federal income tax return for 2015, reporting none of the income that was subject to the termination assessment.  As required by section 6851(b), the IRS sent him a notice of deficiency.  It determined unreported income of $802,083, a deficiency of $273,407, a civil fraud penalty, and an accuracy-related penalty as an alternative.

Acknowledging considerable mystery about the underlying transactions, we decide this case primarily on the basis of burdens of proof.  Respondent has established that petitioner received unreported income, and we sustain his deficiency determination except to the extent that petitioner substantiated deductions or off-

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  We round most monetary amounts to the nearest dollar.

[*3] sets therefrom.  But respondent has not met his burden of showing an underpayment of tax, within the meaning of section 6664(a)(1), that could give rise to any penalty.

## FINDINGS OF FACT

We find the following facts on the basis of the evidence adduced at trial and the facts deemed established by the Court's September 21, 2018, order making absolute a prior order to show cause.[2]  Petitioner resided in Illinois when he petitioned this Court.

Petitioner was born in Nigeria and subsequently moved to the United Kingdom (U.K.), where he obtained citizenship and began practicing medicine.  In 2009 he was accused of misconduct, including the falsification of medical records, that ultimately led to the revocation of his U.K. medical license.  He moved to the United States and became a permanent resident in 2012.  He obtained an MBA degree from DeVry University in 2015.  As of that time he had no background, training, or experience in the oil and gas business.

---

[2]On February 2, 2018, respondent moved for an order to show cause why proposed facts and evidence, as set forth in 159 paragraphs of a proposed stipulation, should not be accepted as established.  On September 21, 2018, we deemed admitted all but 16 paragraphs of the proposed stipulation, making minor changes to some paragraphs for clarity.

[*4] A.     AHPE

Petitioner incorporated American Hope Petroleum & Energy Corp. (AHPE) on January 23, 2015, before completing his MBA program.  He was AHPE's registered agent and sole shareholder, listing his residence as its address.  AHPE had no officers or employees, no board of directors, and no formal capital structure.  It paid no wages, maintained no business formation records, had no financial or accounting records of any kind, and never filed any Federal or State tax returns.  It held no annual (or other) meetings of officers, directors, or shareholders and perforce had no minutes of such meetings.  It had no business address or phone number distinct from petitioner's.  It obtained no permits or business licenses and maintained no insurance policies of any kind.

But AHPE did have a partially-completed website, which petitioner created soon after incorporating it.  The website described AHPE as an "independent crude oil purchasing and selling broker" headquartered in Chicago.  AHPE assertedly had "a team of experts," including "fund managers, partners, and advisors," who were "securely invested in crude purchasing" and about to expand by acquiring an offshore oil block in Nigeria.  Supposedly overseeing this activity was a "board of directors" and an "Advisory Board," ensuring that AHPE operated in accordance with "best practice[s]" and "corporate governance standards."

**[\*5]** Petitioner substantiated none of these representations, and all appear to have been false. AHPE had no discernible business activity. As of February 2015 it consisted of little more than a name on three Bank of America (BoA) bank accounts that petitioner opened in its name in late January 2015.

B.      Alleged Oil Transactions

Petitioner testified that AHPE was in the business of brokering the sale of crude oil owned by the Nigerian National Petroleum Corporation (NNPC). He produced three documents, supposedly issued by NNPC in February and March 2015, purporting to authorize AHPE to sell 5 million barrels of Nigerian light crude--worth over $250 million--then on board vessels off the Nigerian coast. None of these documents was authenticated by any representative of NNPC. At various times NNPC has issued "scam alerts" warning about "advance fee schemes" peddled by "unsavory characters purporting to be * * * contractors to NNPC."

Petitioner produced two documents, each captioned "Sales Purchase Agreement/Commercial Invoice," on AHPE's letterhead. Each document lists AHPE as the seller and AHPE Global Resources, Ltd., allegedly a Nigerian entity, as the "co-seller." Each document is signed by petitioner on behalf of the seller and purports to cover the sale of 2 million barrels of Nigerian light crude.

**[*6]** One document lists Tianjin Commodity Exchange Co., Ltd. (Tianjin), a Chinese entity, as the buyer. This document has signatures and stamps purportedly affixed by an agent of Tianjin. The other document lists LaSalle International Inc. (LaSalle), a U.S. company, as the buyer, and Fengying International Co., Ltd. (Fengying), a Chinese entity, as the "co-buyer." This document has a signature and stamp purportedly affixed by an agent of Fengying. The document lists Pierre Yenokian as the president of LaSalle, but it does not bear his signature or that of any other LaSalle representative. Both documents call for discharge of the crude oil at Yangshan Port, a harbor for container ships south of Shanghai, China.

Each document specified a per-barrel sales price equal to the "average of Brent's three daily crude price averages," less a discount. The Tianjin agreement specified a provisional price of $56 per barrel minus a $4-per-barrel discount. The LaSalle/Fengying agreement specified the same provisional price but inconsistently specified $4-per-barrel and $5-per-barrel discounts in different sections of the agreement.

Each agreement required the buyer to pay advance fees. Under the LaSalle-Fengying agreement the buyer was to pay "$2.0 million Dollars in logistics fees as part payment for cargo and final payments after QnQ." ("QnQ" seems to stand for "quality and quantity" testing of the crude.) The corresponding section of the

[*7] Tianjin agreement specified no logistics fee. However, an amendment to that agreement stated that "[b]uyer prepays US$200,000 to NNPC designated Seller's account with Bank of America."

On March 3, 2015, Tianjin wired $199,985 to AHPE's BoA checking account ending in 9724 (BoA 9724 account). During February and March 2015 LaSalle made three wire transfers totaling $545,000 to that same account. All of LaSalle's wire transfers show them as being authorized by Pierre Yenokian as LaSalle's president. Tianjin and LaSalle thus paid a total of $744,985 in advance fees to AHPE.

As of March 2015 the BoA accounts nominally held by AHPE had received deposits of at least $806,985. Of this total $744,985 came from Tianjin and LaSalle. A fifth deposit was a check for $62,000 written on petitioner's personal account at PNC Bank. This check bore the notation "pay self" in the memo line.

C.    Fraud Investigations

On or about March 3, 2015, petitioner attempted to wire $300,000 from the BoA 9724 account to a bank account in London, England. This account was held in the name of Supply Source Ltd. (SSL account). Petitioner produced a letter dated March 2, 2015, stating that NNPC had "nominate[d] the [SSL account] to receive the logistics of $800,000.00." This document was not authenticated by

[*8] any representative of NNPC. Petitioner testified that the $300,000 wire transfer was intended as part payment of the logistics fees that Tianjin and LaSalle had agreed to pay.

BoA's fraud department flagged this transaction, froze AHPE's accounts, and informed petitioner that it was investigating him for money laundering or other illegal activity. He immediately opened accounts at two other banks. On March 12, 2015, he went to BMO Harris Bank N.A. (Harris) and opened one account in his name (8133 account) and another in AHPE's name (8095 account). On the same day he went to TCF National Bank (TCF) and opened one account in his name (0756 account) and another in AHPE's name (6137 account).

At all times petitioner had control and sole signatory authority over these accounts. During March and April 2015 he used funds in AHPE's TCF account (6137 account) to pay for such personal expenses as airline tickets, stays at the Ritz-Carlton Hotel, merchandise from Sea World and Victoria's Secret, new flooring for his home, and visits to aquariums, Magic Kingdom, and Hollywood movie studios.

After concluding its fraud investigation BoA decided that petitioner's transactions exposed it to excessive risk. It accordingly "force closed" all of

[*9] AHPE's accounts. It gave petitioner cashier's checks, payable to AHPE, in the amounts of the outstanding account balances.

Petitioner deposited most of these cashier's checks into the new Harris accounts. He had opened AHPE's Harris account (8095 account) on March 12, 2015, with a cash deposit of $300. On March 31, 2015, he deposited into that account three BoA cashier's checks totaling $743,761, bringing its balance to $744,061. He had opened his personal Harris account (8133 account) on March 12, 2015, with a cash deposit of $200. On May 6, 2015, he deposited into that account one BoA cashier's check for $63,002.

Harris officials were informed shortly thereafter that the U.S. Secret Service and the Chicago Police Department were investigating petitioner. Harris' fraud department learned that BoA had closed petitioner's accounts because of concerns about the source of his funds. Harris froze his accounts so that it could conduct its own investigation.

D.    IRS Termination Assessment and Levy

The U.S. Secret Service informed the IRS of its concerns about petitioner's suspect banking activity. The IRS noted that BoA had closed petitioner's accounts "based on money laundering red flags," stated its belief that he "ha[d] no assets locally" apart from the Harris bank accounts, and determined that he represented a

**[*10]** "flight risk[] involv[ing] movement of funds out of the country." The IRS accordingly proceeded to make a termination assessment under section 6851(a).

The IRS reconstructed petitioner's income using a bank deposits analysis, including only the two Harris accounts in its calculation. It determined that petitioner, as of May 13, 2015, had received gross income of $802,083. That total represented $744,061 (the sum of the deposits into AHPE's Harris account) plus $58,022 (the balance in petitioner's personal Harris account when the IRS agent made his calculation).[3] Allowing petitioner a standard deduction of $6,200, the IRS determined taxable income of $795,883 and tax of $288,546. It terminated petitioner's taxable year as of May 13, 2015, and assessed the tax.

That same day the IRS issued a notice of levy to Harris for $289,043 (the assessed tax plus estimated interest). Harris withdrew $289,043 from petitioner's accounts and put that sum into escrow pending resolution of petitioner's challenge to the levy. Harris allowed petitioner to withdraw the remaining funds in his accounts, which he did as follows:

---

[3]The deposits into petitioner's personal Harris account, after nontaxable items are subtracted, appear to have totaled $63,202. The IRS agent used $58,022 in his computation after being informed by the Harris fraud investigator that this was the remaining balance in petitioner's personal Harris account at that time. This downward adjustment benefited petitioner.

[*11]

| Account | Date | Withdrawal(s) |
|---|---|---|
| AHPE Harris | June 10, 2015 | $120,000 |
| | June 11, 2015 | 7,500 |
| | June 15, 2015 | 371,590 |
| Total | | 499,090 |

Pursuant to section 7429(b) petitioner challenged the termination assessment and the levy in the U.S. District Court for the Northern District of Illinois. Onyeani, 2016 WL 3149729. On June 3, 2016, the court held that the termination assessment and the levy were reasonable and that the amount assessed was appropriate. Id. at *11. It found that the IRS could reasonably have concluded that petitioner "appeared to be perpetuating a fraud by collecting money for a crude-oil brokering business that did not really exist." Id. at *6. And given AHPE's failure to observe rudimentary corporate formalities, the court found it "reasonable for the IRS to conclude that the income really belonged to Onyeani, who seemed to be using his company as fronts for his own activities." Id. at *9. Following the District Court's decision, Harris paid to the IRS pursuant to the levy the $289,043 held in escrow.

E.   Subsequent Banking Activity

During June 2015 petitioner deposited most of the money from the closed Harris accounts--specifically, Harris cashier's checks totaling $471,590--into the

[*12] TCF account held in AHPE's name (6137 account). He made several other cash deposits (all in small amounts) into that account during 2015. He used the check card for AHPE's 6137 account for a variety of discretionary personal expenses, including travel, meals, payments to a Mercedes dealer, and cable bills. He made nearly a dozen ATM withdrawals (totaling about $1,800) from AHPE's 6137 account. And he made cash transfers totaling about $6,000 from AHPE's 6137 account to his personal TCF account (0756 account).

In July 2015 attorneys for LaSalle told the Department of Justice that LaSalle and its president, Pierre Yenokian, had been defrauded by petitioner. The District Court did not resolve that question during the termination assessment litigation. However, it noted Yenokian's testimony that "LaSalle ultimately reached a private settlement with Onyeani about the disputed funds." Id. at *4.

On August 12, 2015, petitioner wired $400,000 to Pierre Yenokian from AHPE's TCF account (6137 account). Two days later petitioner made two additional wire transfers of $5,000 and $30,000 from that account. The recipient(s) of these latter wire transfers cannot be identified from the record.

F.     Tax Reporting and Examination

Petitioner and his wife filed a joint return for the 2015 calendar year. This return, with signatures dated February 19, 2016, was prepared by Balbuena Busi-

**[\*13]** ness Travel Corp., a paid preparer. The return reported income of $41,983 earned by petitioner's wife, taxable income of $21,383, and total tax of $2,721. The return reported none of the income that was the subject of the IRS termination assessment.

The IRS examined this return. It did not perform a new bank deposits analysis but adopted the analysis performed at the time of the termination assessment. It accordingly determined that petitioner for 2015 had failed to report taxable income of $802,083. As a corollary of that determination, the IRS made computational adjustments to deductions that petitioner had claimed.

The IRS Appeals Office prepared a notice of deficiency and transmitted it to the Office of Chief Counsel for review. An attorney in that office prepared a memo recommending that the IRS assert a fraud penalty under section 6663(a) against petitioner (but not against his wife) and (in the alternative) accuracy-related penalties under section 6662(a). That attorney's immediate supervisor, Abigail Carlson, reviewed the memo and supplied approval by email to assert both penalties. The Appeals Office revised the notice of deficiency accordingly.

On April 26, 2016, the IRS issued a notice of deficiency to petitioner and his wife, determining for the taxable year 2015 a deficiency of $273,407, a civil fraud penalty of $205,055 (determined against petitioner only), and in the alterna-

**[*14]** tive an accuracy-related penalty of $54,681.  Petitioner timely petitioned this

Court for redetermination of the deficiency and penalties.

OPINION

A.    Jurisdiction

Section 6212(a) authorizes the IRS to send the taxpayer a notice of defi-

ciency, and section 6213(a) grants this Court jurisdiction to make a "redetermina-

tion of the deficiency" determined by the Commissioner.  A "deficiency" is gener-

ally defined as the amount by which the taxpayer's correct tax for the year exceeds

"the amount shown as the tax by the taxpayer on his return" plus any "amounts

previously assessed * * * as a deficiency."  Sec. 6211(a)(1).  Section 6211(b)(1)

provides that the taxpayer's correct tax for the year and the tax shown on his re-

turn "shall both be determined * * * without regard to any credits resulting from

the collection of amounts assessed under section 6851 * * * (relating to termina-

tion assessments)."  Thus, the $288,546 termination assessment that the IRS made

against petitioner in May 2015 is disregarded in determining his "deficiency" for

the 2015 calendar year.  That sum will be treated instead as credit against his tax

liability as ultimately determined.  See sec. 1.6851-1(a)(2) and (3), Income Tax

Regs.

[*15] Section 6851(b) provides that, if a termination assessment is made, "the Secretary shall mail a notice under section 6212(a) for the taxpayer's full taxable year * * * with respect to which such assessment was made within 60 days after the later of (i) the due date of the taxpayer's return for such taxable year * * * or (ii) the date such taxpayer files such return." Section 6851(b) specifies that the deficiency thus determined "may be in an amount greater or less than the amount assessed under subsection (a)."

The IRS issued the notice of deficiency to petitioner on April 26, 2016. That date was within 60 days of April 15, 2016, the due date for petitioner's 2015 return. The notice of deficiency was thus timely issued, and we accordingly have jurisdiction to consider this case.

B.     Unreported Income

     1.     Identity of the Taxpayer

As a threshold matter we must decide whether AHPE or petitioner individually should be deemed the taxpayer for purposes of determining unreported income. Generally, the corporate entity will be respected save for "exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." Hosp. Corp. of Am. v. Commissioner, 81 T.C. 520, 579 (1983) (quoting New Colonial Ice Co. v. Helvering, 292 U.S. 435,

[*16] 442 (1934)).  But a corporation is disregarded if it is not "a viable business entity."  N. Ind. Pub. Serv. Co. v. Commissioner, 115 F.3d 506, 511 (7th Cir. 1997) (quoting Bass v. Commissioner, 50 T.C. 595, 600 (1968)), aff'g 105 T.C. 341 (1995).  To qualify as a viable business entity, a corporation "must have been formed for a substantial business purpose or actually engage in substantive business activity."  Ibid.; see Moline Props., Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943); Shaw Constr. Co. v. Commissioner, 35 T.C. 1102, 1114 (1961), aff'd, 323 F.2d 316 (9th Cir. 1963).

Respondent concedes that he has the burden of proof on this point because he "raised for the first time in his Answer the issue of [AHPE's] not being a separate entity for [F]ederal tax purposes."  See Rule 142(a)(1); cf. Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989).  Our determination on this point is "essentially factual," and "[e]ach case turns on its individual facts and circumstances."  Hosp. Corp. of Am., 81 T.C. at 580.

In determining whether a corporation should be disregarded as a separate taxable entity, courts consider such facts as whether the corporation:  (1) filed Federal and State income tax returns; (2) filed Federal employment tax returns; (3) elected officers and directors; (4) had a formal capital structure; (5) maintained books and records; (6) held meetings and kept minutes thereof; (7) had employees

**[\*17]** to whom it paid salaries; (8) had a separate business address and phone number; (9) was properly capitalized; and (10) distinguished between corporate and personal funds. See, e.g., Noonan v. Commissioner, 451 F.2d 992 (9th Cir. 1971) (per curiam), aff'g 52 T.C. 907 (1969); Achiro v. Commissioner, 77 T.C. 881, 901 (1981); Russell v. Commissioner, T.C. Memo. 2019-146, at \*10; Robucci v. Commissioner, T.C. Memo. 2011-19, 101 T.C.M. (CCH) 1060, 1064; Pappas v. Commissioner, T.C. Memo. 2002-127, 83 T.C.M. (CCH) 1713, 1719-1720; Martin v. Commissioner, T.C. Memo. 1999-193, 77 T.C.M. (CCH) 2152, 2155; Visnapuu v. Commissioner, T.C. Memo. 1987-354, 53 T.C.M. (CCH) 1381, 1387; Hagist Ranch, Inc. v. Commissioner, T.C. Memo. 1960-206, 19 T.C.M. (CCH) 1123, 1129, aff'd, 295 F.2d 351 (7th Cir. 1961); see also Kimbrell v. Commissioner, 371 F.2d 897, 902 (5th Cir. 1967) (disregarding a corporation that displayed some corporate formalities because it engaged in no substantial business transactions), aff'g T.C. Memo. 1965-115.

None of these factors supports AHPE's status as a separate taxable entity. It had no officers or employees, no board of directors, and no formal capital structure. It maintained no business formation records apart from a certificate of incorporation. It listed petitioner's residence as its address and had no separate telephone number. It paid no wages and filed no Federal or State tax returns. It main-

**[\*18]** tained no accounting or financial records of any kind. It held no meetings of officers, directors, or shareholders and perforce had no minutes thereof. The representations on its website--that it had "a team of experts" including "fund managers, partners, and advisors" who were "securely invested in crude purchasing," and that it was overseen by a "board of directors" and an "Advisory Board"--were false.

Petitioner did open accounts in AHPE's name at various banks. But he repeatedly used funds in those accounts to defray his personal expenses, thus failing to distinguish between corporate and personal funds. On May 6, 2015, he deposited into his personal Harris account (8133 account) a BoA cashier's check for $63,002 made out to AHPE. During March and April 2015 he used funds in AHPE's TCF account (6137 account) to pay for airline tickets, stays at the Ritz-Carlton Hotel, merchandise from Sea World and Victoria's Secret, new flooring for his home, and visits to aquariums, Magic Kingdom, and Hollywood movie studios. During June 2015 and subsequently he used funds in AHPE's TCF account for a variety of discretionary personal expenses, including travel, meals, payments to a Mercedes dealer, and cable bills. He regularly made ATM withdrawals from AHPE's TCF account and transferred funds from that account into his personal bank account.

**[\*19]** By treating AHPE's funds as his funds petitioner showed that he regarded AHPE as his alter ego rather than as a distinct business enterprise. Respondent has shown by a preponderance of the evidence that AHPE should not be recognized as a separate taxable entity for Federal income tax purposes. The IRS did not err in disregarding AHPE and attributing its tax items to petitioner.[4]

2.     Bank Deposits Analysis

The Commissioner's determinations in a notice of deficiency are generally presumed correct. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). According to the U.S. Court of Appeals for the Seventh Circuit--to which an appeal of this case would seem to lie, see sec. 7482(b)(1)(A)--the presumption of correctness attaches unless the taxpayer demonstrates that the Commissioner's determination "lacks a rational foundation or is arbitrary and excessive," Cole v. Commissioner, 637 F.3d 767, 773 (7th Cir. 2011), aff'g T.C. Memo. 2010-31; see

---

[4]Even if we were to regard AHPE as a real business entity, we would conclude that petitioner was taxable on the income it received because he exercised dominion over its bank accounts and diverted the funds in those accounts to his own purposes. See Minchem Int'l, Inc. v. Commissioner, T.C. Memo. 2015-56, 109 T.C.M (CCH) 1273, 1282 (finding that a taxpayer had income from an account ostensibly held in trust where he "misappropriated the funds for personal use [and] abandoned the intended purpose for which the money was entrusted"), aff'd, 880 F.3d 173 (5th Cir. 2018); see also Rutkin v. United States, 343 U.S. 130, 137 (1952) (stating that gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it").

[*20] Pittman v. Commissioner, 100 F.3d 1308, 1317 (7th Cir. 1996) ("All that is required to support the presumption is that the Commissioner's determination have some minimal factual predicate."), aff'g T.C. Memo. 1995-243. Respondent has clearly connected petitioner with income-producing activity by showing substantial payments from LaSalle and Tianjin. The burden accordingly shifts to petitioner to prove by a preponderance of the evidence that the Commissioner's determinations are arbitrary or erroneous. See Helvering v. Taylor, 293 U.S. 507, 515 (1935); Tokarski v. Commissioner, 87 T.C. 74 (1986).

Where (as here) the taxpayer's records do not clearly reflect his income, the Commissioner is "authorized to use such methods as in his opinion clearly reflected that income." Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), aff'g T.C. Memo. 1966-81. In these situations courts have "long approved" the bank deposits method to reconstruct income. Cole, 637 F.3d at 774-775; cf. United States v. Stein, 437 F.2d 775, 779-781 (7th Cir. 1971) ("[W]e, like other circuits, have previously sustained convictions [for tax evasion] where the only proof of unreported income was a bank deposits analysis."). "The bank deposits method assumes that all money deposited in a taxpayer's bank account during a given period constitutes taxable income, but the Government must take into account any nontaxable source or deductible expense of which it has knowledge."

[*21] Clayton v. Commissioner, 102 T.C. 632, 645-646 (1994); see DiLeo v. Commissioner, 96 T.C. 858, 868 (1991), aff'd, 959 F.2d 16 (2d. Cir. 1992).

The IRS in this case performed a simplified bank deposits analysis, perhaps owing to the urgency attending the termination assessment.  It determined that petitioner had received gross income of at least $802,083, viz., $744,061 (the sum of the deposits into AHPE's Harris account) plus $58,022 (the balance in petitioner's personal Harris account when the IRS agent made the computation).  All of these funds were derived from AHPE's BoA accounts, which had received deposits of at least $806,985, viz., $744,985 from Tianjin and LaSalle, plus a $62,000 check written on petitioner's personal account at PNC Bank which bore the notation "pay self" on the memo line.  We find that these deposits were prima facie evidence of income.

In so concluding we need not decide whether the payments from LaSalle and Tianjin were partial payments for crude oil to be delivered (as petitioner contends) or funds received illegally as part of a fraudulent scheme (as respondent principally contends).  If the former, the payments represented gross receipts; because petitioner established no cost of goods sold, these receipts constituted gross income.  If the funds were received illegally, "the fact that illegal income is taxable is widely known, even among lay people."  United States v. Ytem, 255 F.3d

[*22] 394, 397 (7th Cir. 2001). Illegally-received funds constitute gross income so long as they are received "without restriction as to their disposition" and are not accompanied by "the consensual recognition, express or implied, of an obligation to repay." James v. United States, 366 U.S. 213, 219 (1961); see Mais v. Commissioner, 51 T.C. 494, 499 (1968) (finding that a consensual agreement to repay was not established by "a mere acknowledgment on the part of the embezzler of his legal obligation to repay"). Petitioner received funds from LaSalle and Tianjin without restriction as to their disposition. We consider below whether there was a consensual obligation to repay any portion of those funds.

### 3. Offsets to Bank Deposits

Because the Commissioner's determination of unreported income is entitled to the presumption of correctness, petitioner has the burden of proving by a preponderance of the evidence that this determination was arbitrary or erroneous. See Helvering v. Taylor, 293 U.S. at 515. He first contends that respondent erred in not allowing him a deduction of $15,500 for "loan repayments." Because loan proceeds are excluded from income when received, see United States v. Beavers, 756 F.3d 1044, 1057 (7th Cir. 2014), loan repayments generally are not deductible, see Brenner v. Commissioner, 62 T.C. 878, 886 (1974); Osborne v. Commissioner, T.C. Memo. 2002-11, 83 T.C.M. (CCH) 1083, 1084. Applying a liberal

[*23] construction to pro se briefing, we will interpret petitioner to contend that the IRS erred in neglecting to exclude loan proceeds from its bank deposits analysis.

Petitioner has not established that any loan proceeds were included in respondent's analysis. Of the deposits implicated in that analysis, $744,985 is traceable to receipts from LaSalle and Tianjin. Petitioner supplied no evidence to suggest that these receipts were loans. The remaining funds are traceable to a $62,000 check drawn on petitioner's PNC Bank account that bore the notation "pay self" on the memo line. Petitioner introduced into evidence no records of his PNC Bank account and no loan documents of any kind. Accordingly, he has not met his burden of proving that respondent erred by neglecting to subtract loan proceeds in reconstructing his gross income.

Second, petitioner contends that respondent erred by failing to offset against his gross income the $400,000 that he returned to LaSalle. Respondent concedes that petitioner in August 2015 "transferred $400,000 to Pierre Yenokian, the president of LaSalle." Mr. Yenokian testified during the termination assessment litigation that "LaSalle ultimately reached a private settlement with Onyeani about the disputed funds." Onyeani, 2016 WL 3149729, at *4. The record indicates that petitioner paid $400,000 to Mr. Yenokian to effectuate that settlement.

**[*24]** A subsequent settlement and agreement to repay does not negate a taxpayer's initial receipt of illicit income. See James, 366 U.S. at 219-220; Harp v. Commissioner T.C. Memo. 1996-380, 72 T.C.M. (CCH) 401, 412 n.25. However, the receipt of misappropriated funds is not taxable to the extent those funds are repaid in the same taxable year. See James, 366 U.S. at 220; Mais, 51 T.C. at 499 (noting that embezzler is entitled "to deduct from income of any year any amount repaid in such year in restitution"); Han v. Commissioner, T.C. Memo. 2002-148, 83 T.C.M. (CCH) 1824, 1838 ("Funds over which a taxpayer has obtained dominion and control, lawfully or unlawfully, are not taxable to him to the extent they are repaid before yearend"); cf. Harp, 72 T.C.M. (CCH) at 414 n.29 (no reduction of gross income for current year where repayment occurs in subsequent taxable year).

As respondent has shown, $545,000 of the funds included in the bank deposits analysis was attributable to funds petitioner received from LaSalle during February and March 2015. In August 2015 petitioner returned $400,000 of those funds to Pierre Yenokian, the president of LaSalle. Petitioner contends (and respondent does not dispute) that Yenokian received this $400,000 in his capacity as

[*25] the president (and as an agent) of LaSalle. We conclude that respondent erred in not reducing petitioner's gross income by this $400,000 repayment.[5]

Respondent contends that petitioner has failed to prove that LaSalle and Yenokian were victims of, rather than accomplices in, petitioner's fraudulent scheme. Once again, we find no need to decide whether petitioner engaged in an illicit scheme or (if he did) who the ultimate victims were. The record establishes that petitioner during 2015 paid $400,000 to settle his obligations to La Salle, whatever the nature of those obligations may have been.

When performing a bank deposits analysis, the IRS "must take into account any nontaxable source or deductible expense of which it has knowledge." Clayton, 102 T.C. at 645-646. Petitioner wired $400,000 to LaSalle from AHPE's bank account in August 2015, several months after the IRS had completed its review of petitioner's bank deposits. On its face, this was the sort of payment that the IRS must consider in performing a bank deposits analysis. But when issuing the notice of deficiency, the IRS elected not to perform a new bank deposits analysis for the full 2015 year, relying instead on the simplified analysis it had per-

---

[5]It is irrelevant that the $400,000 repayment occurred in August 2015, after the IRS terminated petitioner's tax year as of May 13, 2015. In this deficiency proceeding we are tasked with redetermining petitioner's tax liability for the full calendar year, not for the five-month period preceding the termination assessment.

[*26] formed previously.  Respondent has failed to rebut petitioner's evidence that he returned $400,000 to LaSalle before year end.  Assuming arguendo respondent's supposition that petitioner was engaged in an illicit scheme, we conclude that this sum should have been offset against his 2015 gross income.[6]

C.    Deductions

Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to all deductions claimed.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); see Rule 142(a).  Taxpayers must substantiate the amounts of their deductions by keeping and producing records sufficient to enable the IRS to determine the correct tax liability.  See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.

Petitioner contends that he is entitled to deduct $61,500 for payments to attorneys and an investigator in connection with the termination assessment litigation during 2015-2016.  Such expenses might be deductible as paid "in connection with the determination, collection, or refund of any tax."  Sec. 212(3); see Com-

---

[6]The same result would follow if we adopted petitioner's view that he was engaged in a legitimate oil brokering business.  In that event the $400,000 refunded to one of his customers during the same year would be an offset to gross proceeds for "returns and allowances."  See Smith v. Commissioner, T.C. Memo. 2015-214, 110 T.C.M. (CCH) 439, 442; 2015 Form 1040, Schedule C, Profit or Loss From Business, Part 1, line 2.

[*27] missioner v. Shapiro, 278 F.2d 556, 560 (7th Cir. 1960), aff'g Int'l Trading Co. v. Commissioner, T.C. Memo. 1958-104. But petitioner is a cash-method taxpayer, and he has not proven that he paid fees to his attorneys or an investigator during 2015. See sec. 6001; sec. 1.461-1(a)(1), Income Tax Regs. At trial he submitted no invoices, canceled checks, or other evidence to substantiate such payments. In any event, the record suggests that petitioner retained the same counsel for various legal services, and he has submitted no evidence that would enable us to estimate what portion of any fees he paid was incurred in connection with the determination, collection, or refund of any tax. See Sholes v. Commissioner, T.C. Memo. 2018-203, at *11 (denying deduction for legal fees where taxpayer did not present evidence of specific services performed).

Petitioner asserts that he incurred deductible travel and entertainment expenses in connection with his alleged oil brokering business. Such expenses are subject to rigorous substantiation requirements under section 274(d). Petitioner submitted no evidence whatsoever to substantiate such expenses, much less evidence that would meet the statutory requirements.

Finally, petitioner contends that the IRS erred in disallowing deductions for student loan interest under section 221(a) and for personal exemptions under section 151. Respondent disallowed these deductions as computational adjustments,

[*28] explaining that petitioner's eligibility to claim these deductions had phased out given the magnitude of his taxable income. See secs. 151(d)(3)(B), 221(b)(2), (f). We will direct the parties to submit computations under Rule 155 addressing petitioner's entitlement (if any) to these deductions.

## D. Penalties

### 1. Burden of Production

Respondent determined a civil fraud penalty under section 6663(a) and (alternatively) an accuracy-related penalty under section 6662(a). Section 7491(c) imposes on the Commissioner the burden of production with respect to the liability of any individual for any penalty. This burden requires respondent to show compliance with (among other things) section 6751(b)(1). See Graev v. Commissioner, 149 T.C. 485, 493 (2017), supplementing and overruling in part 147 T.C. 460 (2016). That section provides: "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination."

The notice of deficiency in this case, as originally drafted by the IRS Appeals Office, included no penalties. Upon review of the draft notice, an attorney in the Office of Chief Counsel prepared a memorandum recommending that penalties

**[*29]** be asserted. That attorney's immediate supervisor, Abigail Carlson, reviewed that memorandum and approved by email the assertion of both penalties. The Appeals Office revised the notice of deficiency accordingly.

In this case the Commissioner's delegate in the Office of Chief Counsel made the "initial determination" to assert the penalties. See Roth v. Commissioner, T.C. Memo. 2017-248, 114 T.C.M. (CCH) 649, 652, aff'd, 922 F.3d 1126 (10th Cir. 2019). Respondent has established compliance with section 6751(b)(1) by showing that the attorney's immediate supervisor approved this determination in writing before the notice of deficiency was issued to petitioner. See Graev, 149 T.C. at 494-498. Respondent has thus met his burden of production.

2.  Civil Fraud Penalty

Section 6663(a) provides that, "[i]f any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." The Commissioner has the burden of establishing fraud, sec. 7454(a), and he must prove fraud by "clear and convincing evidence," Rule 142(b); Pittman, 100 F.3d at 1319; Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989).

**[\*30]** In order to impose the fraud penalty respondent must first show that there was an "underpayment of tax" on petitioner's 2015 return. Section 6664 supplies definitions for purposes of applying chapter 68, subchapter A, part II of the Code, which includes the fraud penalty. Where (as here) no "rebates" have been made, section 6664(a)(1) defines "underpayment" to mean the amount by which the tax imposed for the year (i.e., the correct amount of tax) exceeds the sum of "(A) the amount shown as the tax by the taxpayer on his return, plus (B) amounts not so shown previously assessed (or collected without assessment)."

Additional definitions are supplied by the regulations under section 6664. They apply inter alia "for purposes of * * * section 6663, relating to the fraud penalty." Sec. 1.6664-2(a), Income Tax Regs. They define "amounts not so shown previously assessed" to mean "amounts assessed before the return is filed that were not shown on the return, such as termination assessments under section 6851." Id. para. (d).

Petitioner and his wife signed the 2015 return on February 19, 2016. The "amount shown as the tax" on that return was $2,721. The "amount[] not so shown previously assessed"--viz., the amount of the May 13, 2015, termination assessment--was $288,546. The sum of those amounts, or $291,267, exceeds petitioner's 2015 tax liability as determined in the notice of deficiency, $276,128,

[*31] and substantially exceeds the correct amount of tax for 2015 as redetermined in this opinion. Petitioner thus had no "underpayment of tax" for 2015, and the fraud penalty therefore does not apply. See sec. 6664(a)(1); sec. 1.6664-2(a), (d), Income Tax Regs.

If we were to assume arguendo that respondent has shown an "underpayment of tax," we find that he has failed to prove fraud by clear and convincing evidence. "[F]raud * * * 'is intentional wrongdoing on the part of the taxpayer to avoid a tax known to be owing.'" Granado v. Commissioner, 792 F.2d 91, 93 (7th Cir. 1986) (quoting Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985), aff'g T.C. Memo. 1983-249), aff'g T.C. Memo. 1985-237. To satisfy his burden of proof, the Commissioner must show that the taxpayer "intended to evade taxes that he knew or believed were owed." Pittman, 100 F.3d at 1319; see Zell v. Commissioner, 763 F.2d 1139, 1142-1143 (10th Cir. 1985) ("[T]he intent required is the specific purpose to evade a tax believed to be owing." (quoting Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), rev'g 40 B.T.A. 424 (1939))), aff'g T.C. Memo. 1984-152.

As of February 19, 2016, when petitioner signed his 2015 return, the IRS was well aware of, and had assessed tax upon, $802,083 of income for 2015. As of that date, Harris had withdrawn $289,043 from petitioner's bank accounts to

[*32] pay the assessed tax, and litigation was pending in Federal District Court concerning the propriety of the termination assessment.

Under these circumstances, we do not see how petitioner's failure to report the $802,083 on his 2015 return could be construed as manifesting an intent to deceive the IRS or "evade taxes that he knew or believed were owed." Pittman, 100 F.3d at 1319. Funds to pay the tax were being held in escrow for the IRS, so evasion of the tax was not realistically possible. Petitioner on his 2015 return simply preserved the position that he was then taking in court, viz., that the assessment of $288,546 for 2015 was improper. Although we reject in this opinion petitioner's arguments for excluding all bank deposits from his individual gross income for 2015, this does not mean that his return position to the contrary was fraudulent.

In considering a taxpayer's liability for the civil fraud penalty, courts routinely evaluate a list of factors--commonly called "badges of fraud"--that may indicate fraudulent intent. See Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992); Petzoldt, 92 T.C. at 701. Respondent notes that petitioner during the first half of 2015 displayed several of these behaviors. He did not maintain accurate books and records; he had a history of failing to file tax returns; he opened multiple bank accounts and moved money rapidly among them; he attempted to wire

[*33] $300,000 to a foreign bank account; he engaged in other suspect transactions; and he gave investigators implausible and inconsistent explanations of his activities. But the question before us is not whether petitioner engaged in a scheme to defraud third parties, but whether any underpayment of tax on his 2015 return was due to fraud against the IRS. On a different factual and procedural record, the "badges of fraud" cited by respondent might carry the day, but they would not suffice here in light of the termination assessment and levy.

3.    Accuracy-Related Penalty

For similar reasons we find that petitioner is not liable for an accuracy-related penalty. Like the fraud penalty, this penalty applies only if there is "an underpayment of tax required to be shown on a return." Sec. 6662(a). For this purpose, the term "underpayment of tax" is defined in exactly the same way as for the fraud penalty. See sec. 6664(a)(1); sec. 1.6664-2(a), (d), Income Tax Regs. Because the "amount shown as the tax" on petitioner's 2015 return plus the "amount[] not so shown previously assessed" exceeded his 2015 tax liability as determined in the notice of deficiency and as redetermined in this opinion, petitioner had no "underpayment of tax" for 2015. Without an underpayment, he cannot be liable for an accuracy-related penalty.

**[*34]** To implement the foregoing,

Decision will be entered under

Rule 155.
